Filed 12/7/15

**CERTIFIED FOR PARTIAL PUBLICATION**\*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

<table>
<tr><td>THE PEOPLE,</td><td>B250771</td></tr>
<tr><td>    Plaintiff and Respondent,</td><td>(Los Angeles County<br>Super. Ct. No. BA397144)</td></tr>
<tr><td>    v.</td><td></td></tr>
<tr><td>SERGIO DEALBA,</td><td></td></tr>
<tr><td>    Defendant and Appellant.</td><td></td></tr>
</table>

APPEAL from a judgment of the Superior Court of Los Angeles County, Gail Ruderman Feuer, Judge. Affirmed.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

\*       Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are those portions enclosed within double brackets, **[[ ]]**.

Defendant and appellant Sergio Dealba raises contentions of sufficiency of the evidence and admissibility of prior domestic violence evidence following his conviction of assault with a deadly weapon and spousal battery, with a prior serious felony conviction finding.

While acknowledging the well-recognized rule that an "indirect touching" is sufficient to constitute a battery, Dealba contends there was no indirect touching here because the only thing that happened was that his car collided with another car being driven by the victim, i.e., his car did not directly touch the victim. However, for the reasons discussed below, we conclude Dealba did commit a battery because the evidence demonstrated that the force of the collision he intentionally caused almost made the victim lose control of her car and, as a result, she had to wrestle with the steering wheel in order to keep her car on the road and avoid hitting other vehicles parked along the curb. Although there is a dearth of California case law addressing criminal battery consisting of this type of indirect touching--one vehicle striking another without direct contact with the victim – our decision is consistent with case law from other jurisdictions which have considered the issue.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

D.D. and defendant Dealba had been married for seven or eight years before separating in late February 2012.[1] At that time they had two children, six-year-old S.S. and four-year-old T.T.

---

[1]    All further date references are to the year 2012 unless otherwise specified.

Disagreements arose between D.D. and Dealba regarding custody of the children. At the end of March or during the first week of April, D.D. pulled the children out of the school they had been attending in response to Dealba's behavior: "He would take them out of school during the day in the middle of the day . . . and he would keep them from me. He wouldn't let me see them. He would threaten me that I would never see them again." Around this time, D.D. had been trying to work out a custody arrangement with Dealba, and she was awaiting an upcoming custody hearing.

1. *The charged April 2012 incident.*

On the morning of April 30, D.D. drove the children to a new school on 52nd Street where she hoped to enroll them. As D.D. was preparing to parallel park her Volkswagen Beetle on 52nd, which is a narrow two-way street, Dealba pulled up alongside her in a gray Mazda that belonged to one of his friends. When Dealba got out of the car and walked toward her, D.D. drove away because she was "afraid" and "terrified." Dealba got back into his car, came alongside D.D. by driving in the wrong traffic lane, and began "smashing into [her] car." D.D. testified Dealba collided with the driver's side of her Volkswagen three or four times:

"Q. Well, tell us what you mean by 'smashing.'

"A. He was hitting my car with his car, and I was just trying to keep it straight because my kids were crying and screaming, and I was getting nervous. And there [were] kids walking on the sidewalk, and I just didn't want to hit anybody."

"Q. Now, when . . . he was smashing his car into you, it was so hard, I think you said, you almost lost control; right?

"A. Yes.

"Q. And at least the third or fourth hit, it kept knocking your car over to the side; right?

"A. Yes.

"Q. So far to the side that it seemed like you were about to hit the parked cars that were on the right side of the road?

"A. Yes."

D.D. testified she could see Dealba turning his steering wheel and trying to smash the front of his car into her car.

After the last time Dealba crashed into the Volkswagen, he collided head-on with a pickup truck coming the other way in the left-hand traffic lane. Because she was afraid of taking her eyes off the road, D.D. watched the collision in her rearview mirror: "I never turned. I was afraid that if I even turned for a second, I would lose control, so I saw it through my mirrors."

Dealba's Mazda had crashed into a vehicle being driven by Aida Arteaga, who testified she was driving on 52nd Street when she saw two cars coming toward her side by side. The two cars "were right next to each other." One of them was driving in the proper lane; the other was driving in Arteaga's lane against the flow of traffic. Arteaga did not see the two cars coming at her touch each other. Arteaga testified she "hit the brakes" and came to a stop, but the car in her lane hit the front of her vehicle.[2]

Dealba remained at the accident scene, but D.D. kept driving. She called 9-1-1 and drove to a police station. D.D. testified the collision with Dealba had knocked askew her Volkswagen's sideview mirror, which was now attached to her car only by some wires. The collision also left tire marks and scratches on the side of her car. D.D. agreed with counsel's characterization of the Mazda as riding "higher from the ground than [her] Volkswagen."[3]

---

[2]     Although Arteaga testified her vehicle was "totally destroyed" in the collision and had to be towed away, other evidence indicates it was towed because Arteaga had been taken to a hospital for observation and there was no one else to drive it.

[3]     At the first trial in this matter, which resulted in a hung jury, D.D. described the Mazda as "[m]ore like a SUV."

4

S.S. and T.T., the couple's children, who were sitting in the back seat of the Volkswagen during the incident, both testified they saw Dealba collide with D.D.'s car. S.S. testified the scratches on D.D.'s car had been caused when "[m]y dad tried to crash us over" with another car. S.S. testified he saw Dealba trying to crash into them, but that he didn't feel anything or receive any injuries as a result of the collision. T.T. also testified she saw Dealba crash into them, but she too did not feel anything.

Los Angeles Police Officer Juan Ordaz testified he responded to the accident scene, finding two damaged vehicles: Arteaga's Chevy S-10 pickup truck and Dealba's gray Mazda. When Ordaz subsequently examined D.D.'s Volkswagen at the police station, he saw black marks and scratches running the entire length of the driver's side of the car. The black marks were circular and looked like rubber marks, as if a tire had been rubbing against the side of the Volkswagen.

2. *The prior domestic violence evidence.*

a. *The March 2012 incident involving D.D.*

D.D. testified that on March 2, she was in the car with Dealba and their children. She was sitting in the front passenger seat and Dealba was driving. At this time, D.D. and Dealba were in the middle of working out their separation. D.D. testified she "was trying to make some kind of agreement [regarding visitation], but he was reluctant." D.D. testified they argued about Dealba "trying to keep the kids. He was threatening that I would never see the kids again if I didn't get back with him. He was grabbing me, and he was pulling my hair, and he was holding me down. And he threw me out of the car while it was moving." While guiding the steering wheel with his knee, Dealba had held her down with his right hand and unbuckled her seat belt with his left hand. Then he opened the door and threw her out of the car while it was still moving at 15 to 20 miles per hour.

D.D. fell to the ground, rolled over a couple of times and then jumped up. She was running toward the Inglewood Police Station when she flagged down a passing patrol car. She reported the incident to officers who later photographed the marks on her arms and wrists made by Dealba holding her down. D.D. was afraid Dealba would kill her and hurt the children. Police officer Frederick Osorio testified he observed D.D.'s injuries: "there were markings, redness on her wrists."

S.S. and T.T. both testified they saw Dealba push D.D. out of the car.

b. *The February 2002 prior incident involving Martha A.*

In 2002, Dealba was married to Martha A. At the instant trial, Martha testified as follows: She and Dealba divorced sometime in 2002 or in 2003. On February 10, 2002, they were living together in an apartment when an argument erupted during which they hit each other and Dealba whipped Martha one time with a leather belt. Martha could not recall having sustained any injuries, but acknowledged she might have shown police officers some bruising on her arms and legs caused by the belt. Martha's sister and her sister's children were present in the apartment when this incident occurred.

Dealba, Martha and Martha's sister then got into the car because Martha's sister needed a ride home. Dealba, who was driving, stopped at a friend's house, leaving the others in the car after locking the doors and activating the car alarm. After a while, Martha opened the car door, setting off the alarm. Dealba returned to the vehicle and they argued. When Martha said she was going to leave him, Dealba got upset. Martha's sister intervened and also argued with Dealba. Martha did not recall having told the police that Dealba retrieved a gun and threatened her with it, but she did remember that he told her to get back in the car or he would kill both her and her sister.[4] Martha testified she was not now afraid of Dealba and she denied having told the prosecutor otherwise.

---

[4]    Dealba went to prison for the February 2002 incident, although the jury was not informed of that fact.

6

District Attorney Investigator Jennifer Dubois testified she was present when Martha spoke to the prosecutor just before testifying. Martha told the prosecutor that on February 10, 2002, Dealba whipped her repeatedly and threatened her with a gun. She indicated where her arms had been bruised by the belt. Martha also told the prosecutor that she was afraid of Dealba.

3. *Defense evidence.*

The defense did not present any evidence.

4. *Trial outcome.*

Dealba was convicted of assault with a deadly weapon and spousal battery, with a prior serious felony conviction finding (Pen. Code §§ 245, subd. (a)(1), 243, subd. (e)(1), 667, subds. (b)-(i)).[5] He was sentenced to state prison for a term of eight years, consisting of the upper term of four years for the assault conviction which was then doubled under the Three Strikes law. The trial court stayed sentencing on the spousal battery conviction under section 654, which proscribes multiple punishment for a single act.

## CONTENTIONS

Dealba contends: (1) there was insufficient evidence to support his conviction of spousal battery, and (2) the trial court erred by admitting evidence that he committed domestic violence against a former spouse.

## DISCUSSION

1. *There was sufficient evidence to sustain the spousal battery conviction.*

Dealba contends there was insufficient evidence to sustain his conviction of spousal battery (§ 243, subd. (e)(1)) because there was no evidence of the "touching" element of battery. We disagree.

---

[5] All further statutory references are to the Penal Code unless otherwise specified.

a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

" 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' [Citation.]" (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) As our Supreme Court said in *People v. Rodriguez, supra,* 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn: "The [Court of Appeal] majority's reasoning . . . amounted to nothing more than a different weighing of

8

the evidence, one the jury might well have considered and rejected.  The Attorney General's inferences from the evidence were *no more inherently speculative* than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury."  (*Id*. at p. 12, italics added.)

Section 242 defines a "battery" as "any willful and unlawful use of force or violence upon the person of another."  (§ 242.)  " 'Any harmful or offensive touching constitutes an unlawful use of force or violence' under this statute.  [Citation.]  'It has long been established that "the least touching" may constitute battery.  In other words, force against the person is enough; it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave a mark.' [Citations.]" (*People v. Shockley* (2013) 58 Cal.4th 400, 404-405)  Therefore, "[o]nly a slight unprivileged touching is needed to satisfy the force requirement of a criminal battery." (*People v. Ausbie* (2004) 123 Cal.App.4th 855, 860, fn. 2, disapproved on other grounds in *People v. Santana* (2013) 56 Cal.4th 999, 1011, fn. 6.)

"The force may be directly applied, as by punching, kicking, or tripping the victim.  [Citations.]  Or it may be indirectly applied, e.g., by forcing a person to jump from a window or vehicle.  [Citations.]" (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 14, p. 805; see, e.g., *People v. Flores* (2009) 176 Cal.App.4th 924, 931 [battery by prisoner (§ 4501.5) was committed when defendant spat in guard's face because "the touching can be done indirectly by causing an object to touch the other person, and . . . the slightest touching can constitute a battery"]; *People v. Duchon* (1958) 165 Cal.App.2d 690, 692-693 [defendant committed battery when he threw electric garden shears at victim, who was cut on the arm by blades of the shears and hit on the head by the handle of the shears]; see also CALCRIM No. 960 [alternative instructional language for battery elements reads:  "The touching can be done indirectly by causing an object [or someone else] to touch the other person."].)

9

b. *Discussion*.

Dealba acknowledges the general rule that battery can be committed indirectly by use of an object, but he contends "there was no evidence that [his] automobile caused a touching upon [D.D.]." He argues that although D.D. "testified that [he] used his car to hit her car three or four times, and that he left scratches and black marks on her car," D.D. "did not say that any object touched her as a result of appellant using his car to hit her car. [¶] There were no dents in her car, and she did not testify that as a result of the hitting, that her car touched her. She testified that she did not hit the cars that were parked along the street, and that she kept her hands on the steering wheel and tried to drive straight ahead. Not even the children felt the impact. Therefore, there can be no circumstantial finding that appellant caused a touching of [D.D.]."

The Attorney General argues there was sufficient evidence of a touching because D.D. testified that Dealba "rammed her car with enough force that she almost lost control of her car. Each time appellant rammed D.D.'s car, it knocked her car closer to parked cars on the side of the road. D.D. was afraid of losing control of her car and had to keep her hands on the steering wheel. [¶] Given such evidence, a reasonable trier of fact could have concluded not only that appellant's repeated acts resulted in sufficient force to move or jostle D.D. within her car, but also that appellant's acts caused the steering wheel, which D.D. grasped with her hands, to move, jostle, and exert force within her hands – as the collisions shoved her car closer to the side of the road and caused her to almost lose control of her car. It was reasonable to infer that D.D. braced herself in order to maintain control of her car by keeping her hands on the steering wheel."

Dealba responds to this argument by acknowledging "[i]t is true that D.D. testified that the force of the impacts from appellant's car caused her car to move closer and closer to the cars parked along the side of the road. It is also true that D.D. testified she almost lost control of her car as a result of appellant hitting her car with his car, and that she had

10

to hold onto the steering wheel tightly.[6]  What is missing from the record, however, is any 'reasonable, credible, [or] solid . . .' evidence 'from which a rational [juror] could find [the touching element] beyond a reasonable doubt.' "

We are not persuaded by Dealba's argument.  As he concedes, it is well-established that battery can be committed indirectly, i.e., that the crime does not require a direct touching of the victim's person by the defendant's person.[7]  At the same time, we have found no California cases discussing the type of indirect touching that occurred when Dealba's vehicle struck D.D.'s vehicle without making direct contact with D.D. herself.  However, at least two other state Supreme Courts have held that a battery can be committed in this kind of situation.

In *State v. Townsend* (Idaho 1993) 865 P.2d 972 (*Townsend*), the defendant intentionally drove his pickup truck into his wife's car while both vehicles were traveling 30 or 35 miles per hour, forcing his wife off the road.  The Idaho Supreme Court held the defendant had committed a battery – despite not having directly touched his wife with his truck – reasoning:  "[T]he willful use of force or the intentional striking of another person which is made criminal by [Idaho's battery] statute may be committed indirectly through an intervening agency which the defendant set in motion.  Likewise, it need not be committed directly against the victim; it may be committed against anything intimately connected with the person of the victim.  [Citations.]  Under this view, the use of a motor vehicle to intentionally strike another occupied motor vehicle may constitute battery.  [Citations.]"  (*Id*. at p. 976.)  Although the court's conclusion appeared to rest solely on

---

**6**    Although we agree the only reasonable interpretation of the evidence is that D.D. had to grasp the steering wheel "tightly," she never used that word during her testimony.

**7**    "[T]he common-law concept of 'force' encompasses even its indirect application. 'Force' in this sense 'describ[es] one of the elements of the common-law crime of battery,' [citation], and '[t]he force used' in battery 'need not be applied directly to the body of the victim.'  [Citation.]  '[A] battery may be committed by administering a poison or by infecting with a disease, or even by resort to some intangible substance,' such as a laser beam."  (*United States v. Castleman* (2014) 134 S.Ct. 1405, 1414-1415 [188 L.Ed.2d 426].)

11

the proposition that the victim had been "intimately connected" to her car, *Townsend* relied on a different rationale in responding to the defendant's assertion that he could not have committed battery because there was no evidence the victim had suffered any injury. To that claim *Townsend* replied: "[W]e have little difficulty in concluding that intentionally striking a car with a pickup truck, when both vehicles are being operated at 35 miles per hour, *would generate whatever physical disturbance may be implicitly required by the statute*." (*Id*. at p. 977, italics added.)

In *Clark v. State* (Fla. 2001) 783 So.2d 967 (*Clark*), the Florida Supreme Court applied a similar rationale where the defendant drove his truck into the victim's stationary truck at 25 to 30 miles per hour, spinning the victim around. *Clark* rejected the defendant's argument that the court should enforce "a per se rule that the intentional striking of an automobile can never constitute the touching of the vehicle's occupant for battery purposes unless the occupant suffers some bodily injury." (*Id*. at p. 968.) Instead, *Clark* held that "the circumstances of the case will determine whether a vehicle is *sufficiently closely connected* to a person so that the striking of the vehicle would constitute a battery on the person. Thus, this is generally a question of fact for the jury. [Citation.]" (*Id*. at p. 969, italics added.) *Clark* then went on to add: "There is sufficient connection between a vehicle and a person where there is evidence of the touching required for a battery, such as the impact of the vehicle contact 'spun' the occupant of the vehicle." (*Ibid*.) Applying this rule, *Clark* held that – because the victim "was 'spun' about when Clark's vehicle impacted his truck" – the evidence "certainly qualifies as intentionally touching another person for purposes of proving a simple battery." (*Ibid*.)[8]

While agreeing with the majority's conclusion that the defendant was guilty of battery, the concurring justice in *Clark* urged a different rationale: "I concur in the majority's opinion, but I have difficulty with the legal issue being framed in terms of a

---

[8]  A somewhat related question was addressed in the recently-decided case of *In re B.L.* (2015) 239 Cal.App.4th 1491, which involved a juvenile who knocked a walkie-talkie out of a teacher's hand. The Court of Appeal held, as a matter of first impression in California, that the juvenile had committed a battery.

12

'sufficient connection' between the occupant and his or her vehicle, [citation], when the real issue is whether the victim was 'touched' through the force of impact by being jostled or otherwise impacted through the transference of energy from the collision." (*Clark v. State*, *supra*, 783 So.2d at p. 969 [conc. opn.].)

We believe the concurring opinion in *Clark* was properly focused on the key issue raised by the facts of both *Clark* and *Townsend*: Was there evidence that the indirect impact generated by a particular vehicular collision had been sufficiently forceful to establish the "touching" element of battery?

Applying this kind of "force/impact" analysis, we conclude there was sufficient evidence to sustain Dealba's battery conviction. The evidence amply demonstrated that it was precisely D.D.'s struggle to keep her Volkswagen from veering into the parked cars that constituted the unprivileged "touching" inflicted on her by Dealba. Dealba concedes the evidence demonstrated that in order to counteract the force generated by the colliding vehicles, D.D. had to grip the steering wheel tighter and struggle to keep the Volkswagen from crashing into cars parked along the curb. Defense counsel essentially acknowledged this fact during closing argument by telling the jury: "According to [D.D.], he is slamming his car over and over into hers at least four times. Hit her so hard her car is getting knocked to the side where she almost loses control twice."

Further, D.D.'s testimony established that when Dealba collided with her, she had to wrestle with the steering wheel to prevent the Volkswagen from veering toward the right: "He was hitting my car with his car, and I was just trying to keep it straight . . . . And there [were] kids walking on the sidewalk, and I just didn't want to hit anybody." It was this increased force on D.D.'s hands and arms, as she was compelled to tighten her grip on the steering wheel, that constituted the "touching" element of the battery. This increased force on D.D. was caused by Dealba's intentional act of crashing into D.D.'s car as they were driving along the street.

It does not matter that D.D. *already* was touching the steering wheel before Dealba collided with her. If A gently places his hand on B's shoulder with B's permission, there is no battery. However, if A then – without moving the position of his

13

hand – suddenly exerts sufficient force to push B over (assuming B did not consent to being pushed), A has committed a battery although the position of his hand on B's shoulder never changed.  This is similar to what happened here, except that the force exerted by Dealba was indirect rather than direct:  he drove his car into D.D.'s car, the force of which "touched" her hands and arms through the steering wheel.

In sum, we conclude there was sufficient evidence to sustain Dealba's spousal battery conviction.

**[[ Begin nonpublished portion ]]**

**[[** 2.  *Other crimes evidence was properly admitted.*

Dealba contends his convictions must be reversed because the trial court erred by admitting evidence that he had previously committed domestic violence against a former spouse.  We find no error.

a.  *Legal principles.*

"Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion.  Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, fn. omitted.)  Subdivision (b) allows evidence of a person's uncharged misconduct "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

Hence, "[e]vidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts. (Evid. Code, § 1101.)  However, the Legislature has created exceptions to this rule in cases involving sexual offenses (Evid. Code, § 1108) and domestic violence (Evid. Code, § 1109)." (*People v. Reyes* (2008) 160 Cal.App.4th 246, 251.)  Evidence Code section 1109 provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence,

14

evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."[9] (Evid. Code, § 1109, subd. (a)(1).) "Section 1109, in effect, 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]' [Citations.] '[I]t is apparent that the Legislature considered the difficulties of proof unique to the prosecution of these crimes when compared with other crimes where propensity evidence may be probative but has been historically prohibited.' [Citation.]" (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233.)

" 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases.' " (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419.) "[T]he statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation. [Citation.] Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the 'typically repetitive nature' of domestic violence. [Citations.] This pattern suggests a psychological dynamic not necessarily involved in other types of crimes. [Citation.]" (*People v. Johnson* (2010) 185 Cal.App.4th 520, 532, fns. omitted (*Johnson*).)

A trial court's decision to admit evidence under Evidence Code section 1109 is reviewed for abuse of discretion. (*People v. Brown*, *supra*, 192 Cal.App.4th at p. 1233.) Evidence of prior acts of domestic violence offered pursuant to Evidence Code section 1109 is admissible unless there is a probable danger of undue prejudice resulting from its admission which substantially outweighs its probative value. (Cf. *People v. Callahan* (1999) 74 Cal.App.4th 356, 368; *People v. Soto* (1998) 64 Cal.App.4th 966,

---

[9] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

15

984.)  A trial court enjoys broad discretion under Evidence Code section 352 in assessing whether the probative value of prior domestic violence evidence is outweighed by concerns of undue prejudice, confusion, or consumption of time.  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)  " 'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is . . . "prejudging" a person or cause on the basis of extraneous factors.  [Citation.]' "  (*People v. Zapien* (1993) 4 Cal.4th 929, 958; see *People v. Karis* (1988) 46 Cal.3d 612, 638 [prejudice " 'applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual' "].)

In addition, subdivision (e) of Evidence Code section 1109 provides that evidence of other acts of domestic violence that occurred "more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."  (Evid. Code, § 1109, subd. (e).)  Hence, "while evidence of past domestic violence is presumptively admissible under subdivision (a)(1), subdivision (e) establishes the opposite presumption with respect to acts more than 10 years past."  (*People v. Johnson*, *supra*, 185 Cal.App.4th at p. 537, fn. omitted.)  "Subdivision (e) establishes a presumption that conduct more than ten years prior to the current offense is inadmissible.  But, contrary to defendant's insinuations, it sets a threshold of presumed inadmissibility, not the outer limit of admissibility.  It clearly anticipates that some remote prior incidents will be deemed admissible and vests the courts with substantial discretion in setting an 'interest of justice' standard.  We therefore review that determination for abuse of discretion.  [Citations.]"  (*Id*. at p. 539.)

b. *Discussion*.

Dealba does not contest admission of the evidence regarding his prior violence against D.D. (i.e., the March 2012 incident), but he does claim the trial court abused its discretion by admitting Martha's testimony. He argues the February 2002 incident Martha described was not only "more egregious than the charged offense and quite inflammatory," but also "so dissimilar to the charged offense[s] that it could not possibly have been more probative than prejudicial." Dealba purports to find the following significant differences between the February 2002 incident and the charged offense: "The two incidents involved different victims, different conduct and different weapons. . . . In addition, while the whipping and threatening of Martha A. with a gun seemed to have been done in the middle of an argument, there was no argument present in this case. [D.D.] testified that as soon as [Dealba] got to the front of his car, she sped off in her car and no words were exchanged."

Initially, we note that our Supreme Court has pointed out – in a case involving Evidence Code section 1108, the parallel provision allowing propensity evidence in sexual assault cases – that " '[t]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108.' [Citation.]" (*People v. Loy* (2011) 52 Cal.4th 46, 63.) Even if entirely dissimilar, "this circumstance, although relevant to the trial court's exercise of discretion, is not dispositive." (*Ibid*.)

Moreover, the dissimilarities[10] noted by Dealba (e.g., the difference in weapons: an automobile versus a belt and a gun) are relatively unimportant compared to what the Attorney General accurately characterizes as the "one inescapable and unifying pattern of

---

[10] Although D.D. and Dealba may not have exchanged any words just before Dealba assaulted her with his car, and thus they were not literally arguing at that very moment, they were clearly in the midst of an ongoing dispute about their relationship, just as Martha and Dealba apparently had been. D.D. testified Dealba had been threatening her life almost daily since she left him in February 2012.

17

behavior – that appellant struggled with accepting marital separation and had a demonstrated predisposition to resort to violence and threats when presented with such a scenario."

The defense at trial set up a classic "he said, she said" credibility contest. Although Dealba did not testify, defense counsel told the jury during closing argument that D.D. "was lying to you" about Dealba having deliberately crashed into her, asserting that the Volkswagen would have been much more severely damaged had Dealba intentionally crashed into her, and that Arteaga would have been able to see him doing it. Defense counsel then proposed this counter-narrative: Dealba had been following D.D. in his car only because he wanted to talk to her about the children, and colliding with her Volkswagen had been entirely accidental. Counsel argued, "He followed her. He drove up alongside her. . . . [¶] And he looks up to see Ms. Arteaga's car in front of him, tries to get out of the way, probably swiped [D.D.'s] car, and then head-ons with Ms. Arteaga. That is a reasonable explanation for what happened that day."

Given this defense, the prior incidents of domestic violence were extremely probative because they demonstrated Dealba's propensity for engaging in domestic violence, thereby corroborating D.D.'s testimony that Dealba committed assault with a deadly weapon. The March 2012 incident was probative because Dealba became violent with D.D. while they were arguing about child custody issues. The February 2002 incident was probative because Dealba drew a gun on a different spouse – threatening to kill Martha after she said she was going to leave him. As in *Johnson*, this evidence suggested Dealba "has a problem with anger management, specifically with regard to female intimate partners, and specifically when he feels rejected or challenged by such a partner. . . . Whatever the psychological forces at work, the Legislature has concluded that in these types of cases, evidence of past domestic violence is particularly probative of the likelihood to repeat such behavior." (*Johnson*, *supra*, 185 Cal.App.4th at p. 533.)

Again paraphrasing *Johnson*, what also weighed in favor of admitting the February 2002 incident was the fact that this evidence "came from independent sources, which reduced the danger of fabrication. [Citation.]" (*Johnson*, *supra*, 185 Cal.App.4th

18

at p. 533.)[11] The evidence of the February 2002 incident was not confusing because it was "separated by time and involved different victims and witnesses." (*Id.* at p. 533.) Nor did it consume an inordinate amount of time; Martha's testimony took up only 16 pages in the reporter's transcript, and Dubois's testimony just three pages. The February 2002 incident was not particularly inflammatory compared to the charged crime: hitting Martha with a belt and threatening her with a gun was not egregiously worse than assaulting D.D. with an automobile.

As for the ten-year remoteness rule set forth in Evidence Code section 1109, subdivision (e), the trial court pointed out that, although the February 2002 incident occurred more than ten years earlier, it did so only "by two and a half months." The trial court also pointed out that Dealba went to prison for the February 2002 incident and was not released on parole until the end of December 2003. Therefore, Dealba had only been at liberty for roughly eight years out of the ten-year window period. (Cf. *People v. Loy*, *supra*, 52 Cal.4th at p. 62 [remoteness factor in sexual assault case mitigated because defendant had been in prison for some of that time].) The trial court said, "[T]he reason why I'm inclined to think it's in the interests of justice is because it is very probative."

We cannot say the trial court abused its discretion by concluding the February 2002 incident was more probative than prejudicial and, therefore, admissible despite having occurred slightly more than ten years prior to the charged offense. **]]**

**[[ End nonpublished portion ]]**

---

**11** Another factor relied on by *Johnson* was also present here: "In addition, defendant was convicted of the prior offenses. Although the jury was not so informed, the fact that the prior misconduct had resulted in conviction . . . reduced the likelihood that defendant could have produced evidence to rebut the witnesses' testimony. Therefore, the unfairness of forcing a defendant to mount a defense against evidence of a long-past incident was not a legitimate consideration in this case. [Citation.]" (*Johnson*, *supra*, 185 Cal.App.4th at p. 533.)

19

*DISPOSITION*

The judgment is affirmed.

**CERTIFIED FOR PARTIAL PUBLICATION**


EDMON, P. J.


We concur:



ALDRICH, J.



JONES, J.*

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.