Filed 7/15/16  P. v. Meza CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LARRY TONY MEZA,<br><br>    Defendant and Appellant. | F071303<br><br>(Super. Ct. No. F13906167)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Gary D. Hoff, Judge.

Anne V. Moore, under appointment by the Court of Appeal, for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Gomes, Acting P.J., Detjen, J. and Peña, J.

Following a bench trial, the court convicted appellant Larry Tony Meza of assault on a peace officer (count 3/Pen. Code § 245, subd. (c)),[1] and two counts of evading a peace officer (counts 1 & 2/Veh. Code, § 2800.2, subd. (a)). In a separate proceeding, Meza admitted a serious felony enhancement (§ 667, subd. (a)), two prior prison term enhancements (§ 667.5, subd. (b)), and allegations that he had a prior conviction within the meaning of the Three Strikes law (§ 667, subds. (b)-(i)).

On appeal, Meza contends: (1) the evidence is insufficient to sustain his conviction for assault on a police officer; (2) the term imposed on his evading a peace officer conviction in count 2 violates section 654; (3) the court erred by ordering restitution to an insurance company; and (4) the stayed prior prison term enhancement must be stricken. We find merit to the last two contentions and modify the judgment accordingly. In all other respects, we affirm.

## FACTS

On June 27, 2013, at approximately 7:00 p.m., Clovis Police Corporal Kory Westbury was dispatched in his patrol truck to University Market in Clovis, California, on a report of a light colored Lexus with red paper plates from Premier Auto being driven recklessly. In route he saw a vehicle matching the description traveling east on Shaw Avenue (Shaw). Westbury made a U-turn and began following the Lexus as it drifted from the middle lane in and out of the lane closest to the sidewalk. At Clovis Avenue, the Lexus turned south and accelerated. Westbury followed the Lexus and attempted to stop it by activating his red light and siren. The Lexus, however, accelerated away from the officer at approximately 80 miles an hour, and Westbury called in a pursuit. The Lexus cut off vehicles and drove in and out of traffic, making other vehicles slam on their brakes or causing them to have to change their lane of travel. At Clovis Avenue and Ashlan Avenue (Ashlan), the Lexus ran a red light as it turned west onto Ashlan, which

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

caused several other vehicles to slam on their brakes to avoid a collision. Based on the number of vehicles on the road and the way the Lexus was being driven, Westbury discontinued the pursuit.

Corporal Westbury then went to University Market and took a photo of a monitor as it displayed a portion of the market's surveillance video that showed a Lexus and its driver. The Lexus resembled the one he had been chasing.

On June 28, 2013, at approximately 7:30 a.m., Clovis Police Detective Jared Binford was in a patrol car facing westbound on Shaw, waiting to turn south on Willow Avenue, when he saw a white Lexus traveling north on Willow Avenue turn right on Shaw so it was traveling eastbound. The Lexus matched the description provided by Officer Westbury at a briefing that morning of the Lexus involved in the pursuit the previous evening. The driver's face matched the face of the driver in the surveillance video photo shown to him by Westbury. After Binford made eye contact with the driver, the Lexus revved its motor and drove off at a fast pace eastbound on Shaw. Binford, however, was unable to pursue the Lexus because he was boxed in by other vehicles.

At about 8:10 a.m., Clovis Police Officer Phillip Garcia was on patrol in a marked car when he saw the Lexus with red Premier Auto paper plates at a red light in the northbound lane of Minnewawa Avenue, about to turn westbound onto Shaw. Garcia radioed that he had the Lexus involved in the chase the previous day in his sight and was going to make a traffic stop. As he traveled west on Shaw, Garcia waited to activate his red light and siren until a unit driven by Detective Binford was close by, and until Garcia was two to three car lengths behind the Lexus. The Lexus then accelerated away and Garcia heard Binford call out the pursuit over the radio. As it attempted to elude the officers, the Lexus reached speeds of 80 miles per hour, swerved between the number one and number three lanes, and ran two red lights. At Woodrow Avenue and Shaw, the Lexus encountered stalled traffic. As some cars pulled over and others stopped on the roadway, the Lexus maneuvered between cars and traffic lanes as it pulled away from

3

Garcia. The Lexus then struck a Honda on its right side and the trailer hitch of a truck in front of it.

Detective Binford was able to maneuver through stalled traffic and position his patrol car in front of the Lexus so it was facing the Lexus at an angle. Meanwhile, Officer Garcia pulled up four to six feet behind the Lexus in an attempt to box it in. The Lexus attempted to push through the cars with its wheels spinning and emitting white smoke, but it was unable to because its right front corner was hooked on the truck's trailer hitch. Garcia saw the Lexus's reverse lights turn on as it backed up into Garcia's patrol car while traveling 5 to 10 miles an hour. The Lexus then drove forward traveling 5 to 10 miles an hour. With tires spinning, screeching, and emitting smoke, it struck Binford's unit in the right front corner with a sudden, sharp, jarring impact that caused his patrol car to "rock" up. Binford placed his vehicle in park and got out to make a felony stop. As he ran to the Lexus, its tires continued to spin and emit smoke.

Meanwhile, Garcia moved forward in order to further limit the space in which the Lexus could maneuver. As Garcia got out of his patrol car, the Lexus's tires were still spinning and emitting smoke. Garcia drew his firearm and began shouting orders at the driver of the Lexus. Garcia and Officer Herrick went to the passenger's side, saw a male adult in the driver's seat, and began ordering him to place his hands up or on the steering wheel. Instead, the driver, who was subsequently identified as Meza, closed the window, which required Garcia to break it in order to open the door and pull Meza out of the car. As Garcia was handcuffing Meza, he heard Meza say something to the effect that he "messed up."

Meza's Lexus was similar to the Lexus Corporal Westbury observed in the University Market surveillance video. Additionally, Meza was wearing clothing and had tattoos similar to those of the man Westbury saw in the surveillance video and had pursued the previous evening. Westbury concluded that Meza was the driver of the car involved in that pursuit.

The collision with the Lexus caused minor damage to Officer Garcia's patrol car. Detective Binford's patrol car, however, did not fare as well. His collision with the Lexus pushed the front right corner and wheel well of his patrol car back into the tire.

On March 12, 2015, the court denied Meza's *Romero*[2] motion and sentenced him to an aggregate 16-year term: a five-year term on count 3, doubled to 10 years because of Meza's prior strike conviction, concurrent terms of six years (middle terms of three years doubled) on counts 1 and 2, a five-year serious felony enhancement, an unstayed one‑year prior prison term enhancement, and a stayed one-year prior prison term enhancement.

## DISCUSSION

### *The Sufficiency of Evidence Claim*

" 'In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] … The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] " 'Although it is the duty of the [court] to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " " ' " ' " [Citation.]

---

**2**      *People v. Superior Court* (*Romero*) (1993) 13 Cal.4th 497.

5

" ' "An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence." [Citation.] "Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact]." ' " (*People v. Dealba* (2015) 242 Cal.App.4th 1142, 1148-1149.)

Section 245, subdivision (c) punishes assaults on a peace officer or fireman committed "with a deadly weapon or instrument other than a firearm, or by any means likely to produce great bodily injury." Whether or not the victim is injured is immaterial because the statute focuses on use of a deadly weapon or instrument or, alternatively, on force likely to produce great bodily injury. (*People v. Russell* (2005) 129 Cal.App.4th 776, 781-782.) "*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." (CALCRIM No. 3160.)

"[A]n item commonly used for a nonviolent purpose, such as a baseball bat or a table leg, could qualify as a [dangerous or deadly weapon] ... only 'when the attendant circumstances, including the time, place, destination of the possessor, the alteration of the object from standard form, and other relevant facts indicate[ ] that the possessor would use the object for a dangerous, not harmless, purpose.' " (*People v. King* (2006) 38 Cal.4th 617, 624.) Additionally, "[w]hen an instrument is capable of being used in a dangerous or deadly manner and it may fairly be inferred from the evidence in a specific case that the defendant intended so to use it, its character as such a weapon is established." (*People v. Claborn* (1964) 224 Cal.App.2d 38, 42.)

After backing up into Officer Garcia, Meza had only four to six feet of space between his Lexus and Detective Binford's patrol car. This did not allow him to accelerate to more than 5 to 10 miles an hour before the Lexus struck Binford's car. However, the force of the impact was strong enough to sharply jolt Binford's car, lift it up, and cave in the wheel well of one of the patrol car's tires. Additionally, the

6

magnitude of the Lexus's force caused its tires to lose traction, screech, and emit smoke when it was unable to move the patrol car because Binford had put it in park, and possibly because the Lexus was stuck on a truck's trailer hitch.

A car is capable of being used as a deadly weapon. (*People v. Claborn*, *supra*, 224 Cal.App.2d at p. 42.) Further, the circumstances noted above amply support the conclusion that Meza used his car in a manner that could inflict great bodily injury or death, and that he intended to use his car as a deadly weapon in his violent attempt to evade the officers.

Meza contends, without citing any supporting authority, that when an object does not cause any injuries and is not inherently a deadly weapon, the analysis of whether that object is a deadly weapon must consider the amount of force used and the relative power and vulnerability of the assault victim. He also cites the following circumstances to contend he could not have assaulted Detective Binford with the Lexus because the Lexus could not apply enough force to Binford to cause him death or great bodily injury: the Lexus was in a small, confined space when it struck Binford's car; Binford was safely in his car when the Lexus struck his car; and, at the time, the Lexus was caught on a trailer hitch and could not go anywhere. Meza is wrong.

"[A]n assault may occur even when the infliction of injury is prevented by environmental conditions or by steps taken by the victims to protect themselves." (*People v. Chance* (2008) 44 Cal.4th 1164, 1173, *People v. Valdez* (1985) 175 Cal.App.3d 103, 112-113 [defendant guilty of assault with a firearm based on firing three rounds from distance of 10 feet at cashier standing behind bulletproof glass, even though cashier did not suffer injuries because glass did not break].) Since Meza struck Detective Binford's car with the Lexus, an object clearly capable of inflicting death or great bodily injury, and Meza intended to use the Lexus as a deadly weapon, his inability to inflict injury on Binford did not prevent him from assaulting Binford.

7

Meza misplaces his reliance on *People v. Beasley* (2003) 105 Cal.App.4th 1078 (*Beasley*) to argue otherwise. In *Beasley*, the defendant hit the victim on one occasion with a broomstick on the arms and shoulders, leaving bruises. On another occasion, he struck the victim with a vacuum cleaner extension once on her shoulder and once on her neck, also leaving bruises. In overturning the defendant's two assault with a deadly weapon convictions that were based on these incidents, the court noted that the victim's testimony was too cursory to establish that either object used to assault her was capable of causing, or likely to cause, great bodily injury or death. It also noted that the record did not establish the composition, weight or rigidity of the broomstick, or the shape or size of the vacuum extension, and that the extension must have been hollow to function as part of a vacuum cleaner. (*Id*. at p. 1087-1088.)

*Beasley* is easily distinguishable because the automobile used here was clearly an object that could inflict great bodily injury or death and the evidence supports a finding that Meza used his Lexus in a manner that could cause great bodily injury or death when he rammed Detective Binford's car. And, as noted above, it is not necessary for the victim to be injured for a defendant to be convicted of assault. Accordingly, we reject Meza's contention that the evidence is insufficient to sustain his conviction for assault with a deadly weapon.

### The Section 654 Issue

Meza's evading a peace officer conviction in count 2 was based on the pursuit that occurred on June 28, 2013. His assault on a peace officer conviction in count 3 was based on the assault that occurred after Meza got stuck in traffic and the officers boxed him in. Meza contends that because the offenses underlying his convictions in counts 2 and 3 were committed with the singular objective of escaping, pursuant to section 654 the court should have stayed the term imposed on his evading conviction in count 2. We reject this contention.

8

Section 654, subdivision (a) provides, in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Under the plain language of the statute, multiple punishment, whether consecutive or concurrent, may not be imposed for a single "act or omission." (*Ibid. People v. Deloza* (1998) 18 Cal.4th 585, 594.) Section 654 also prohibits multiple punishment for multiple acts which comprise an "indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.)

A course of conduct is "indivisible" if the defendant acts with "a single intent and objective." (*In re Jose P.* (2003) 106 Cal.App.4th 458, 469.) "If, on the other hand, [the] defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).) "The question of whether the defendant held multiple criminal objectives is one of fact for the trial court, and, if supported by any substantial evidence, its finding will be upheld on appeal." (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1466.) The court's findings may be either expressed or implied from the court's ruling. (*People v. McCoy* (1992) 9 Cal.App.4th 1578, 1585.)

"[T]he fact certain acts are proximate in time is not determinate in finding an indivisible course of conduct. Multiple criminal objectives may divide those acts occurring closely together in time." (*People v. Bradley* (1993) 15 Cal.App.4th 1144, 1157, disapproved on another point in *People v. Rayford* (1994) 9 Cal.4th 1, 7.) Thus, as our Supreme Court noted in *People v. Latimer* (1993) 5 Cal.4th 1203 (*Latimer*), "Some [decisions] have narrowly interpreted the length of time the defendant had a specific objective, and thereby found similar but *consecutive* objectives permitting multiple

9

punishment." (*Id.* at pp. 1211–1212.)  The court in *Latimer* cited *People v. Trotter* (1992) 7 Cal.App.4th 363 (*Trotter*) as one example.  (*Latimer*, *supra*, at p. 1212.)

In *Trotter*, the defendant was punished separately for two of three gunshots fired at a pursuing officer.  On appeal, the court rejected the defendant's claim of a single objective—"to avoid apprehension"—concluding that it was proper to punish him separately for the first two shots, which were fired "within one minute" of each other.  (*Trotter*, *supra*, 7 Cal.App.4th at p. 366.)  The court observed: "Defendant's conduct became more egregious with each successive shot.  Each shot posed a separate and distinct risk to [the officer] and nearby freeway drivers.  To find section 654 applicable to these facts would violate the very purpose for the statute's existence" (*id.* at p. 368), which is "'to insure that a defendant's punishment will be commensurate with his culpability.'"  (*Id.* at p. 367.)

"Furthermore, [*Trotter*] was not a case where only one volitional act gave rise to multiple offenses.  Each shot required a separate trigger pull.  All three assaults were volitional and calculated, and were separated by periods of time during which reflection was possible.  None was spontaneous or uncontrollable.  'Defendant should … not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his … assaultive behavior.' "  (*Trotter*, *supra*, 7 Cal.App.4th at p. 368, citing *Harrison*, *supra*, 48 Cal.3d at p. 338.)  Finally, the court also observed that "even under the long recognized 'intent and objective' test, each shot evinced a separate intent to do violence .…"  (*Ibid.*)

Meza had time during the chase, which began in Clovis and ended in Fresno, to contemplate his actions and desist from his unlawful attempt to evade the officers.  Further, when Meza rammed Detective Binford's patrol vehicle, he was no longer in a position to escape because his Lexus was boxed in by several vehicles, including two police vehicles.  This circumstance permits the reasonable inference that defendant sought to evade Binford and the other police officers pursuing him, and that after coming

10

to a stop, he sought to harm Binford or his patrol car by revving his engine and ramming Binford's vehicle. Consequently, substantial evidence supports the court's implied finding that defendant entertained multiple criminal objectives.

Moreover, "at some point the means to achieve an objective may become so extreme they can no longer be termed 'incidental' and must be considered to express a different and a more sinister goal than mere successful commission of the original crime. We should not lose sight of the purpose underlying section 654, which is 'to insure that a defendant's punishment will be commensurate with his culpability.' " (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 191.)[3] For all these reasons, we conclude that the court did not violate section 654 when it imposed a concurrent term on Meza's evasion of a peace officer conviction.

### The Trial Court Erred When It Ordered Meza to Pay Restitution to the Insurance Company

The cost of repairing the Honda damaged during the pursuit of Meza totaled $1,377.43. At Meza's sentencing hearing, the court ordered Meza to pay Karambir Bajwa, the Honda's owner, $500 for his out-of-pocket expenses relating to those damages and $877.43 to Kemper Insurance for money it paid to repair the Honda. Meza contends

---

**3**    In *Harrison*, the Supreme Court found that multiple sex offenses committed in a short period of time against the same victim may be punished separately. (*Harrison*, *supra*, 48 Cal.3d at p. 325.) Meza contends *Trotter* was wrongly decided because it extended the reasoning of *Harrison*, which he contends is applicable only to "the difficult commonalities of sexual offenses[.]" We summarily reject this contention because in *Latimer*, the Supreme Court cited *Trotter* and other cases addressing the ambit of section 654 with approval stating: "We also stress that nothing we say in this opinion is intended to cast doubt on any of the later judicial limitations of the *Neal [v. State* (1960) 55 Cal.2d 11] rule. For example, we do not intend to question the validity of decisions [including *Trotter*] finding consecutive, and therefore separate, intents, and those finding different, if simultaneous, intents.… Multiple punishment in those cases remains appropriate." (*Latimer*, *supra*, 5 Cal.4th at pp. 1211-1212, 1216.)

11

the court erred when it ordered him to pay $877.43 to Kemper Insurance. Respondent concedes and we agree.

> "In [*People v. Birkett* (1999)] 21 Cal.4th 226 [*Birkett*], the Supreme Court considered the impact that reimbursement of losses by a victim's own insurance carrier may have on a defendant's restitution obligation under former section 1203.04. After an extensive review of the legislative history behind both the constitutional and statutory mandates for victim restitution [citation], the court held that restitution awards cannot be split between the victim and the insurer that had partially reimbursed the victim. The court reasoned as follows: '[T]he Legislature intended to require a probationary offender, for rehabilitative and deterrent purposes, to make full restitution for all "losses" his crime had caused, and that such reparation should go entirely to the individual or entity the offender had directly wronged, regardless of that victim's reimbursement from other sources. Only the Restitution Fund was eligible to receive any part of the full restitutionary amount otherwise due to the immediate victim. [¶] Thus, except as against the Restitution Fund, the immediate victim was entitled to receive from the probationer the full amount of the loss caused by the crime, regardless of whether, in the exercise of prudence, the victim had purchased private insurance that covered some or all of the same losses ….' " (*People v. Hamilton* (2003) 114 Cal.App.4th 932, 940-941.)

In accord with *Birkett*, we conclude the court erred in awarding Kemper Insurance $877.43 in restitution that should have been awarded directly to victim Bajwa, the owner of the Honda.

### The Court Erred in Staying One Prior Prison Term Enhancement

Meza's prior serious felony enhancement was based on his 2006 conviction for assault on a peace officer or fireman with a deadly weapon, other than a firearm, or by means of force likely to cause death or great bodily injury. The prior prison term enhancement the court stayed was based on the prison term Meza served on that conviction. Meza contends the court erred by its failure to strike this prison term enhancement because it was based on the prison term he served on the conviction underlying his serious felony enhancement. Respondent concedes.

12

In *People v. Jones* (1993) 5 Cal.4th 1142 the Supreme Court held that a defendant's sentence cannot be enhanced both for a prior conviction and for a prison term imposed for that conviction. (*Id*. at pp. 1144-1145.) If this occurs, the proper remedy is to strike the one-year prior prison term enhancement. (*Id*. at p. 1153.) Thus, we agree with the parties that the court erred when it imposed a stayed prior prison term enhancement based on the prison term Meza served on his 2006 assault on a peace officer conviction.

## DISPOSITION

The judgment is modified to strike the stayed prior prison term enhancement that was based on the prison term Meza served on his 2006 conviction for assault on a police officer in violation of section 245, subdivision (c) and to strike the restitution order requiring Meza to pay Kemper Insurance $877.43. The trial court is directed to issue an amended restitution order that directs Meza to pay victim Bajwa $1,377.43 in restitution for the damage to his Honda. The trial court is further directed to prepare an abstract of judgment that incorporates the above modifications and to forward a certified copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.