Filed 5/12/16  Gonzales v. City of Long Beach & Citizens Police Complaint Comm. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

<table>
<tr><td>

THOMAS GONZALES,

    Plaintiff and Appellant,

v.

CITY OF LONG BEACH & CITIZENS POLICE COMPLAINT COMMISSION,

    Defendant and Respondent.

</td><td>

B249060

(Los Angeles County
Super. Ct. No. NC053533)

</td></tr>
</table>

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph E. DiLoreto, Judge.  Reversed in part and affirmed in part.

Westrup & Associates, R. Duane Westrup; Ko Legal, Kimberly Olson; Commerford Legal and Marisa Commerford for Plaintiff and Appellant.

Charles Parkin, City Attorney, and Haleh R. Jenkins, Deputy City Attorney for Defendant and Respondent.

Plaintiff and appellant Thomas Gonzales was employed by the City of Long Beach (the City) as an investigator for the Citizen Police Complaint Commission (CPCC). After the City terminated Gonzales's employment, he sued the City and the CPCC (defendants) for, among other things, retaliation in violation of the California Fair Employment and Housing Act (FEHA) and Labor Code section 1102.5. The trial court granted summary adjudication on four of Gonzales's five causes of action, and the matter proceeded to jury trial on the single remaining claim, retaliation in violation of the FEHA. The jury rendered a verdict for the City.

Gonzales appeals. He contends the trial court erred by granting the City's motion for summary adjudication on his Labor Code section 1102.5 "whistleblower" cause of action, and by failing to give three special jury instructions he requested at trial. We conclude the former contention has merit, but the latter does not. Accordingly, we reverse the trial court's grant of summary adjudication on the Labor Code section 1102.5 cause of action, but otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The CPCC and Gonzales's employment*

In 1990, voters in the City of Long Beach amended the City's charter to establish the CPCC, which independently investigates allegations of misconduct by Long Beach police officers. The CPCC is comprised of 11 citizen commissioners who are appointed by the mayor and are not employed by the City. The CPCC maintains a staff of investigators, who are city employees under the authority of the city manager. Investigators handle complaints received from the Long Beach Police Department's (LBPD's) internal affairs division and other sources. During the initial complaint review process, staff can determine that no further action is required ("NFA"). Commissioners meet periodically to review files that have been referred to it by the investigative staff. The commissioners recommend the appropriate level of discipline to the city manager, who makes a final disposition of complaints.

Gonzales was hired as an at-will, part-time CPCC investigator in November 1999, working 20 hours per week and reporting to CPCC Executive Director Ronald Waugh. In 2004, William Ward replaced Waugh as executive director and became Gonzales's direct supervisor. At all relevant times, Gerald Miller was the city manager and Reginald Harrison was the assistant city manager. Miller terminated Gonzales's employment in September 2006, after an investigator determined Gonzales violated City ethics and conflict of interest policies.

2. *The complaint*

After his termination, Gonzales sued the City. His operative first amended complaint (hereinafter complaint) alleged five causes of action: retaliation in violation of the FEHA (count 1, Gov. Code, § 12940);[1] race or ethnicity discrimination in violation of the FEHA (count 2, § 12940, subd. (a)); "failure to take reasonable steps to prevent" discrimination in violation of the FEHA (count 3, § 12940, subd. (k)); violation of the Family and Medical Leave Act of 1993 (count 4, 29 U.S.C. § 2601); and whistleblower retaliation (count 5, Lab. Code, §1102.5). As relevant to the issues presented on appeal, the complaint's factual allegations were as follows.

a. *Gonzales's complaints and alleged actions in response*

In late 2004, Gonzales noted that "cases involving minority complainants were not being properly investigated" and "were more commonly being classified as . . . NFA['s]." Gonzales told Ward: " 'The CPCC appears to be too close to the police department and not neutral enough.' " Ward denied these concerns were valid.

On March 4, 2005, Gonzales observed a police officer spit on a Hispanic youth who was sitting in front of Gonzales's residence. Gonzales told the youth he had the right to file a formal complaint. Gonzales told Ward about the incident. Ward and two LBPD internal affairs officers thereafter insisted that Gonzales sign a formal complaint regarding it. Gonzales resisted but eventually complied because he was afraid of losing his job.

---

[1]    All further undesignated statutory references are to the Government Code.

3

Also in March 2005, a Hispanic family contacted Gonzales complaining about alleged police misconduct involving racial profiling, intimidation, improper arrest, and the use of profanity. Ward refused to accept the complaint because it contained " 'too many issues.' " Gonzales told Ward the family had the right to have the entire complaint investigated.

On March 22, 2005, Ward told Gonzales that Police Chief Anthony Batts had expressed concern Gonzales was soliciting complaints against the LBPD, and if this was true, Gonzales needed to stop. Gonzales responded that community outreach and providing citizens with information was his job. Gonzales informed Ward that "high ranking police staff" had attended three community outreach meetings and, as a result, Hispanic families felt "too intimidated" to file complaints. Gonzales averred that allowing the police chief to issue directives to any CPCC employee could be perceived as a conflict of interest, and "questioned to whom Ward's alliance was truly being given."

Ward criticized Gonzales for documenting "too many issues" in regard to an April 21, 2005 complaint that alleged an LBPD officer had assaulted a Hispanic youth. Gonzales again told Ward that complainants had the right to have all their concerns addressed, regardless of ethnicity. Ward replied that LBPD officers were unhappy with Gonzales's work.

On March 14 and May 5, 2005, respectively, without conducting "any investigation whatsoever," Ward determined a Hispanic male's complaint that a police officer stole his property and physically assaulted him during his arrest, and a Hispanic woman's complaint that an officer offered to release her in exchange for sexual favors, were unfounded. Gonzales's concerns about these decisions were ignored.

In May 2005 Ward reminded Gonzales that he was an at-will employee. From that point forward, Gonzales's "case load began to dwindle while the number of CPCC cases being held in abeyance continued to increase."

4

In August 2005 Gonzales confronted Ward about a complaint filed months earlier, in which a Black woman accused officers of "ransacking her home" without legal authority. Gonzales told Ward it appeared that the LBPD's Internal Affairs department had intentionally omitted allegations when it investigated. Gonzales asked Ward to reopen the investigative file. Ward relieved Gonzales of the case file, and the complaint was not further processed.

On October 25, 2005, Gonzales requested that he be considered for a full time position.

Also in October 2005, Ward refused to accept four anonymous complaints made telephonically to the CPCC regarding LBPD shootings of a Hispanic youth and another man. Ward stated he did not believe in anonymous complaints and ordered Gonzales to "leave the issues alone." Gonzales replied that pursuant to the City's charter, citizens had a right to remain anonymous. Ward confiscated Gonzales's notes and no further action was taken on the complaints.

On October 31, 2005, Miller congratulated Ward for convincing a potential complainant that she lacked a basis for filing a complaint. Gonzales "confronted Ward, pointing out that by 'thwarting complaints against the police,' " Ward created the appearance of acting "in direct contravention of the CPCC's Charter."

On November 2, 2005, Ward failed to process or investigate a complaint from a Hispanic woman who alleged that LBPD officers entered her home without legal authority and refused to release her upon discovering she was not the person for whom they were looking.

On November 3, 2005, Gonzales informed Ward via email that he had attended a police academy training course at which the instructor stated: " 'Mexicans commit crimes like murder and go back to Mexico.' " Gonzales opined that the comment was "not only racial profiling but, prejudicial and discriminatory as well." Ward angrily responded, " 'Don't you think the Chief has this e-mail?' "

Gonzales's complaint on the "spitting incident" was heard by the commission on November 10, 2005. Gonzales was "met with sarcasm and hostility" from some of the commissioners. One told him, "You go straight to jail." Another stated, "You have been voted off the island." Another, while discussing a different case, said "[w]ell, he did not spit on anyone." The spitting incident complaint was determined to be unfounded, damaging Gonzales's credibility. Gonzales complained to Ward about the comments and about what he viewed as Ward's failure to properly investigate the spitting incident. He opined that he was being retaliated against for having made the complaint, and the commissioners' conduct had created a hostile environment. Ward stated he had not heard anything at the commission meeting that was intended to demean or embarrass Gonzales.

Approximately one week after the November 10, 2005 commission meeting, Ward informed Gonzales he would be required to work during regular business hours. Gonzales believed this precluded him from conducting field interviews, pursuing leads, and otherwise investigating complaints because the typical complainant was unavailable during weekday hours.

In January 2006, Gonzales told Ward he had examined a file regarding a Hispanic woman's complaint and discovered "problems with the way the investigation had been performed" that favored the LBPD. Ward responded that the internal affairs commander did not believe additional information or investigation was necessary. Two days later, Ward informed Gonzales that the "brass" was "not happy" with him.

On February 13, 2006, Ward issued to Gonzales a "formal disciplinary action memorandum," entitled "Issues of Concern." In it, Ward accused Gonzales of showing favoritism to Hispanic complainants and having a personal interest in the outcome of cases. Three commissioners had complained to Ward about Gonzales openly siding with a complainant, Jessica Quintana, at a February 9, 2006 hearing. Ward also criticized Gonzales for including a note detailing Quintana's position as a community activist in the case file without Ward's approval or knowledge.

Gonzales responded in writing in a February 15, 2006 memorandum. He averred he had followed procedures and had not attempted to assert undue influence on the hearing's outcome. An internal affairs commander was permitted to "speak out in defense of officers who came before the Commission which was a blatant violation of CPCCs Charter." Gonzales also stated that "CPCC investigators had become nothing more than stenographers for" the police department; the police officers' association had "far too much influence over" the CPCC; many CPCC commissioners had direct ties to the police department, "thereby resulting in a corrupt system that relied upon deficient investigations and biased motivations which only served to perpetuate the pattern of abuse and corruption," the very problem the CPCC was created to address; in his opinion, the CPCC "had 'crossed the blue line into subjectivity' "; since Ward's appointment, the CPCC processed fewer complaints and conducted fewer investigations; and Ward and the internal affairs department ensured the investigations were "too deficient" to be meaningful or effective. Since he began complaining about the "disparity in treatment imposed upon those Complainants who were of Hispanic [descent]," Gonzales had been subject to differential treatment and adverse action by management, including being relieved of his duty to review "no further action" files, the discontinuation of his flexible schedule accommodation and change in his work hours, and the denial of his requests for salary increases and full time work.

In subsequent communications, Gonzales asked whether Ward, Miller and Harrison intended to address his concerns. Ward responded that he was troubled by Gonzales's handling of the situation and was losing confidence in Gonzales as a result. Ward advised Gonzales to take his concerns up "with the EEO." Ward added he was extremely upset over the " 'black eye' " Gonzales's allegations had given him; accused Gonzales of " 'using the race card' "; and cautioned that Gonzales had " 'angered the brass.' " Gonzales declined to file a formal EEO complaint.

In March 2006, CPCC commissioners voted to remove questions relating to complainants' race and ethnicity from CPCC forms and reports except where racial profiling was an issue. Gonzales objected that removal of this information would make it impossible to "assess connections between" race and the complaints.

On April 3, 2006, Gonzales learned that a new investigator had been hired for the full time position for which he had applied.

On April 20, 2006, Gonzales learned that Ward and the CPCC's executive secretary were "tracking his time and keeping a journal on his movements." Ward explained that the secretary had informed him Gonzales had not been working all the hours he had been claiming. Gonzales told Ward this monitoring created a "hostile working environment." No other similarly situated employee had been subject to the same scrutiny.

In April 2006, the City's EEO director, Dora Hogan, offered to arrange a mediation between Gonzales and the City; however this offer was ultimately withdrawn. Gonzales told her "his complaints ran much deeper than the defendants' Title VII violations. Rather, at their heart, was the interference with the CPCC's mandate by the PD and its Chief which . . . resulted in incomplete investigations, biased results and, in many cases, no action being taken at all."

On May 22, 2006, Ward reduced Gonzales's hours to 20 hours per week, from the 25 hours per week he had been working.

On July 27, 2006, Ward told Gonzales he could work his 20 hours in any combination he wished, as long as he worked during regular business hours. Gonzales replied that he had been subjected to adverse employment actions motivated by a desire to penalize him for "having complained about what he reasonably believed was Ward's refusal to fully and fairly investigate all CPCC complaints, regardless of the race or ethnicity of the citizen who brought it." Ward responded that if Gonzales needed to work after 5:00 p.m., all he needed to do was ask. Gonzales stated that the scheduling "preclude[d] him from performing any substantive work" and was an attempt to push him out of his job.

8

On August 14, 2006, Gonzales recommended to Ward that two "no further action" complaints involving the alleged use of excessive force on Hispanic males be "elevated to formal investigation." Gonzales's review of the files led him to believe the internal affairs department had failed to conduct adequate investigations. Neither complaint was ever investigated.

b. *The Boecker complaint and Gonzales's termination*

On July 18, 2006, Ward notified Gonzales that community member Maria Boecker[2] had alleged Gonzales had committed misconduct. During a May 3, 2006 public meeting, Boecker claimed that Gonzales had assisted her with a CPCC complaint and then attempted to convert that contact into a business relationship for personal financial gain for himself and his wife. The City employed an outside firm, and investigator Roger Sobie, to investigate the allegations.

On September 15, 2006, Ward gave Gonzales a letter signed by Miller, indicating Gonzales's employment was being terminated.

3. *The summary adjudication motion*

The City moved for summary judgment or, in the alternative, summary adjudication. Because Gonzales here challenges only the trial court's ruling on the fifth cause of action for retaliatory discharge in violation of Labor Code section 1102.5, we limit our discussion to that aspect of the motion.

The City argued it was entitled to summary adjudication because: (1) Gonzales's complaint failed to allege he was engaged in a protected activity; (2) Gonzales could not establish a causal connection between his complaints and any adverse employment action; (3) except for the termination, none of the conduct alleged constituted adverse employment action; and (4) the City had a legitimate, nonretaliatory basis for terminating Gonzales.

Gonzales responded that his complaints to the CPCC were protected activity as a matter of law; he was not required to allege with specificity that his disclosures revealed

---

[2]     Boecker's name is alternatively spelled "Boecher" in the record.

violations of particular statutes or regulations, and his use of the "buzz words" discriminatory, hostile environment, retaliation, harassment, racial profiling, Title VII,[3] and the like in the complaint were sufficient; his termination was not the only adverse action at issue, and the City failed to provide legitimate explanations for its other actions against him; and the outside investigation into the Boecker complaint was biased and flawed.

The trial court granted summary adjudication on the second through fifth causes of action, but denied it on the first, for retaliation in violation of the FEHA. It did not specify the basis for its determination in either a written or oral ruling, in contravention of Code of Civil Procedure section 437c, subdivision (g).

4. *Trial, verdict, and appeal*

The matter proceeded to trial on the first cause of action for retaliation in violation of the FEHA, section 12940, subdivision (h). The jury rendered a verdict for the City. Gonzales timely appealed.

DISCUSSION

1. *The trial court erred by granting summary adjudication on the Labor Code section 1102.5 cause of action*

a. *Gonzales's complaint sufficiently alleged that he engaged in protected activity under Labor Code section 1102.5*

(i) *Labor Code section 1102.5*

At the time the City's motion was heard, Labor Code section 1102.5, subdivision (b)[4] provided: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or

---

[3]     Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) (Title VII).

[4]     Labor Code section 1102.5 was amended effective January 1, 2014, and now encompasses "noncompliance with a local, state, or federal rule or regulation." (Stats. 2013, ch. 781, § 4.1.) All further citations to section 1102.5 are to the former version of the statute.

10

federal statute, or a violation or noncompliance with a state or federal rule or regulation." Labor Code section 1102.5 is a whistleblower statute, which reflects the broad public policy of encouraging workplace whistleblowers to report unlawful acts without fear of retaliation. (*Hager v. County of Los Angeles* (2014) 228 Cal.App.4th 1538, 1548 (*Hager*); *McVeigh v. Recology San Francisco* (2013) 213 Cal.App.4th 443, 468 (*McVeigh*).) An employee engages in protected activity under Labor Code section 1102.5, subdivision (b) when he or she discloses reasonably based suspicions of activities that violate a federal or state constitutional, statutory, or regulatory provision. (*McVeigh, supra*, at p. 469; *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 850 (*Mize-Kurzman*); *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384 (*Patten*); *Mueller v. County of Los Angeles* (2009) 176 Cal.App.4th 809, 821–822.) Disclosures involving internal personnel matters, as opposed to violations of law, do not fall within the statute's ambit. (*Edgerly v. City of Oakland* (2012) 211 Cal.App.4th 1191, 1199-1203; *Patten, supra,* at pp. 1384-1385.) A government employee's report to his employer qualifies. (*Hager, supra,* at p. 1548.)

To establish a prima facie case of retaliation under Labor Code section 1102.5, subdivision (b), the plaintiff must show he engaged in protected activity, his employer subjected him to an adverse employment action, and there is a causal link between the two. If the plaintiff meets his prima facie burden, the defendant has the burden to prove a legitimate, nonretaliatory explanation for its actions. The burden then shifts back to the employee to show that the explanation is a pretext for the retaliation. (*Hager, supra,* 228 Cal.App.4th at p. 1540; *McVeigh, supra,* 213 Cal.App.4th at p. 468; *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 138; *Patten, supra,* 134 Cal.App.4th at p. 1384.)

11

(ii) *Standard of review*

A motion for summary judgment is properly granted only when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc. § 437c, subd. (c); *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460; *Roman v. BRE Properties, Inc.* (2015) 237 Cal.App.4th 1040, 1050.) The moving party bears the burden of showing the plaintiff has not established, and cannot reasonably expect to establish, a prima facie case. (*Miller, supra,* at p. 460.) We review a grant of summary judgment de novo. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 (*Yanowitz*).) We begin by identifying the issues framed by the pleadings since it is these allegations to which the motion must be directed. (*Higgins-Williams v. Sutter Medical Foundation* (2015) 237 Cal.App.4th 78, 80.) We take the facts from the record that was before the trial court when it ruled on the motion. (*Yanowitz, supra,* at p. 1037.)[5] "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz,* at p. 1037; *Miller,* at p. 460; *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 474.)

---

[5] The City argues that Gonzales's appeal must fail because he has not provided (1) the reporter's transcript of the June 15, 2011 hearing on the motion for summary judgment or adjudication; and (2) a copy of the final judgment or order on the motion. In regard to the hearing on the motion for summary adjudication, the record is adequate. The reporter's transcript contains a June 14, 2011 hearing, at which the trial court took the motion under submission, and a notice of ruling provided by the City that so states. A subsequent notice of ruling prepared by the City indicates that the trial court issued its ruling on June 15, 2011. Thus, it appears the reporter's transcript includes the only hearing on the motion.

Attached to the notice of ruling prepared by the City is the court's minute order stating its ruling on the summary judgment motion. As noted, it does not appear a written order detailing the basis for the trial court's decision exists. On June 23, 2011, the City requested that the trial court specify the basis for its finding that a triable controversy existed on the first cause of action. (Code Civ. Proc., § 437c, subd. (g).) Gonzales avers that the trial court did not respond to the request, and argues that the court's ruling must be reversed because the court's rationale is not clear. However, unlike in the authority cited by Gonzales, the absence of a statement of reasons does not prohibit meaningful review here. (Cf. *Main Street Plaza v. Cartwright & Main, LLC* (2011) 194 Cal.App.4th

12

(iii) *Gonzales sufficiently alleged the "protected activity" element of his prima facie case*

The City argues that the trial court properly granted summary adjudication on the Labor Code section 1102.5 cause of action because Gonzales's complaint failed to establish the first element of his prima facie case, i.e., that he engaged in a protected activity. The City contends Gonzales failed to, and is unable to, identify any state or federal statute, regulation, or constitutional provision that may have been violated by the conduct he disclosed. (See *Jadwin v. County of Kern* (E.D.Cal. 2009) 610 F.Supp.2d 1129, 1154 ["To have a reasonably based suspicion of illegal activity, the employee must be able to point to some legal foundation for his suspicion – some statute, rule or regulation which may have been violated by the conduct he disclosed"]; *Love v. Motion Industries, Inc.* (N.D.Cal. 2004) 309 F.Supp.2d 1128, 1134 [plaintiff's reports of safety concerns about a construction project did not constitute protected activity under Labor Code section 1102.5 where he failed to allege or point to violation of any specific federal or state statute, rule or regulation].)

We disagree. The City is certainly correct that most of Gonzales's disclosures pertained to matters that were not, as a matter of law, violations of state or federal statutes, regulations, or constitutional provisions. As alleged in the complaint, the majority of Gonzales's disclosures pertained either to alleged violations of the City's

---

1044, 1058.) Given that our review of the court's ruling is de novo, the absence of an order detailing the trial court's analysis is not fatal.

The City also argues that relief should be denied because Gonzales's opposition to the summary judgment motion was procedurally deficient. We agree that many of the responses in Gonzales's separate statement did not unequivocally state whether facts were disputed, or succinctly cite supporting evidence. (See generally *Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 71-72; *California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22-23.) However, Gonzales's separate statement was not so deficient as to cause us to affirm on this procedural ground. (See generally *Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1209-1210.) Moreover, although the record is missing the majority of exhibits attached to Gonzales's opposition, as discussed *post* we have obtained the trial court's file and the exhibits are contained therein.

charter, or to internal personnel matters. For example, his allegations that the police department exercised too much influence over the CPCC; that the CPCC was too closely allied with the police; that Ward or the CPCC failed to adequately investigate complaints; that "high ranking police staff" attended community meetings; that CPCC commissioners voted to remove questions relating to race and ethnicity from CPCC forms and reports; and that he was criticized for inserting the note in the Quintana complaint file, all pertained to either internal personnel matters or violations of the City's charter, rather than to violations of state or federal statutes, regulations, or constitutional provisions. Indeed, Gonzales's complaint and opposition below expressly characterized many of his complaints this way.[6] He alleged that at the heart of his complaints "was the interference with the CPCC's mandate by the [police department] and its Chief which, in turn, resulted in incomplete investigations, biased results, and in many cases, no action being taken at all."

Disclosures of violations of the City charter do not constitute protected activity under the version of Labor Code section 1102.5 that was in effect at the time. (See *Edgerly v. City of Oakland, supra,* 211 Cal.App.4th at p. 1205 ["perceived violations of the City's charter and local rules and ordinances . . . are not within the purview of [Labor Code] section 1102.5, and [plaintiff's] whistleblower claim fails as a matter of law"].) Neither do disclosures of internal personnel matters rise to the level of whistleblowing for purposes of Labor Code section 1102.5. (*Patten, supra,* 134 Cal.App.4th at pp. 1384-1385 [disclosures that "indisputably encompassed only the context of *internal personnel matters* involving a supervisor and her employee, rather than the disclosure of a legal

---

[6] In his opposition below, Gonzales argued his complaint described "37 separate complaints" he made between October 2004 and September 2006, and averred that "half" of them "related to Ward's refusal to follow the mandates of the CPCC's Charter" based on what Gonzales believed was Ward's "discriminatory animus." His complaint specifically averred that Ward's action of "thwarting complaints against the police" appeared to contravene the "CPCC's Charter"; he objected to Ward's refusal to accept anonymous complaints because the City charter allowed for such complaints; and he objected that an internal affairs officer was allowed to speak in defense of officers "which was a blatant violation of CPCC's Charter."

violation" do "not amount to whistleblowing as a matter of law"].) It is also true that Gonzales's complaint, his opposition below, and even his briefs on appeal, fail to expressly allege that particular complaints amounted to disclosures of violations of particular statutes, regulations, or constitutional provisions.

Nonetheless, although Gonzales failed to point to specific statutory provisions, this is not a case in which he clearly *cannot* do so. At least some of the allegations in the complaint, fairly read, do amount to disclosures of a violation of a state or federal statute or constitutional provision. Gonzales alleged that in March 2005 he observed a police officer spit on a Hispanic youth, and reported the officer's conduct to his supervisor. Spitting on another person is a battery, and therefore a violation of Penal Code section 242. (*People v. Hamilton* (2009) 45 Cal.4th 863, 934 [evidence that defendant spat upon a deputy was sufficient to establish he committed a battery, defined as any willful and unlawful use of force or violence upon the person of another]; see *People v. Dealba* (2015) 242 Cal.App.4th 1142, 1149-1150.) Gonzales alleged that when he made this disclosure, he was forced to file a formal complaint against his wishes and suffered retaliation as a result.

The complaint also alleged that on several occasions, Gonzales disclosed to Ward that community members were complaining of acts by police that, if proven to be unlawful, would have violated statutes or constitutional provisions. These allegations included the following: a March 2005 disclosure that a family had alleged racial profiling and improper arrest; an April 2005 disclosure of a complaint alleging a youth had been "physically assaulted" by an officer; an October 2005 disclosure of four anonymous complaints about two incidents in which police officers shot and killed two persons; and a November 2005 disclosure of a woman's complaint that officers had entered her home without a warrant or other legal authority and refused to release her upon learning she was not the person for whom they were looking. Disclosure of these citizen complaints by Gonzales revealed allegations of potential Fourth Amendment

15

violations as well as unlawful assault and homicide.[7] Gonzales did not personally witness these events, but he disclosed the alleged violations of law to his supervisor for appropriate action.[8] The City did not offer evidence rebutting the allegations of Gonzales's complaint on these issues, but contended the complaint failed to state a prima facie case. Gonzales alleged that he was retaliated against for the entire course of conduct related to his complaints, both those involving disclosures of allegedly illegal activity and those that we conclude did not. Whether Gonzales reasonably believed CPCC complainants were subjected to unlawful treatment, whether the City retaliated against him, and for which of his many intertwined complaints and actions the retaliation was inflicted, were disputed issues of fact; the City did not attempt to prove otherwise. We cannot say, at the summary judgment stage, that as a matter of law the allegations in the complaint failed to allege any protected disclosures for purposes of Labor Code section 1102.5. Summary adjudication therefore should not have been granted on the Labor Code section 1102.5 cause of action on the ground the complaint failed to allege a prima facie case.

b. *The City failed to establish the absence of material issues of fact for each of the alleged adverse employment actions*

The City further argued that, assuming Gonzales established he engaged in a protected activity, he nonetheless was unable to demonstrate a causal connection between the protected activity and his termination, the only adverse action at issue. In the City's view, other than the termination, none of the conduct alleged constituted adverse actions

---

[7]     We do not suggest that any of the complaints were meritorious or that Long Beach police officers actually engaged in the conduct alleged.

[8]     The complaint also alleged that Gonzales complained that a variety of complaints required further or more complete and unbiased investigation. In these instances, in which Gonzales did not take the complaint in the first instance, his concerns about inadequate investigation do not qualify as protected activity under Labor Code section 1102.5, in that he was not disclosing a violation of law.

16

as a matter of law, because none materially affected the terms, conditions or privileges of Gonzales's employment. We disagree.

In *Yanowitz,* our California Supreme Court defined the meaning of "adverse employment action." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1049.) *Yanowitz* concluded "the proper standard for defining an adverse employment action is the 'materiality' test, a standard that requires an employer's adverse action to materially affect the terms and conditions of employment" when considered in the totality of the circumstances.[9] (*Id.* at p. 1036.) The determination of what qualifies as an adverse action is not susceptible to a mathematically precise test, and must be evaluated by taking into account the legitimate interests of both the employer and the employee. (*Id.* at p. 1054.) Treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion qualifies. (*Id.* at pp. 1054-1055; see also *Malais v. Los Angeles City Fire Dept.* (2007) 150 Cal.App.4th 350, 357.) Each alleged retaliatory act need not constitute an adverse employment action in and of itself; we consider the allegations collectively. (*Yanowitz*, at pp. 1055-1056.) "[T]here is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries." (*Id.* at p. 1055.)

On the other hand, minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable. (*Yanowitz, supra,* 36 Cal.4th at p. 1054.) " 'A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient.' [Citation.] ' "[W]orkplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the

---

[9] Although *Yanowitz* addressed the definition of adverse employment action for purposes of the FEHA, this same standard applies when the cause of action is retaliation in violation of Labor Code section 1102.5. (*Patten, supra,* 134 Cal.App.4th at pp. 1387-1388.)

level of a materially adverse employment action." [Citation.] If every minor change in working conditions or trivial action were a materially adverse action then any "action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." [Citation.]' [Citation.]" (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 386-387; *Malais v. Los Angeles City Fire Dept., supra,* 150 Cal.App.4th at pp. 357-358.)

Gonzales's complaint alleged the following series of adverse actions in addition to his termination: (1) In May 2005, after his report of the spitting incident and his conversations with Ward about several citizen complaints and CPCC investigations, Gonzales's case load "began to dwindle" although the volume of pending cases increased; (2) in approximately November 2005, one week after the commission hearing on the spitting incident complaint, Gonzales's flexible work schedule was withdrawn; (3) at some point, he was relieved of the duty to review NFA files; (4) in February 2006, Ward gave him the "Issues of Concern" memo, which Gonzales characterizes as a "formal disciplinary action memorandum"; (5) in March 2006 Gonzales "stopped receiving any substantive work to speak of"; (6) in April 2006, his request for full time work was denied; (7) in April 2006, the department secretary and Ward began "tracking his time and keeping a journal on his movements," scrutiny to which other employees were not subjected; and (8) in May 2006, his hours were cut from 25 to 20 per week.

We cannot say, as a matter of law, that the alleged acts failed to qualify as adverse employment actions. *Yanowitz* noted that similar actions may constitute adverse employment action. (*Yanowitz, supra,* 36 Cal.4th at p. 1060 [trier of fact could find series of actions including criticism from superiors was an adverse employment action]; *id.* at pp. 1056, fn. 16, 1060-1061 [citing cases holding reduction of duties, refusals to promote, and disadvantageous assignments as examples of adverse actions].) Cutting Gonzales's hours by 20 percent and denying him full time work certainly materially affected the conditions of his employment, as did eliminating job duties and removing substantive work assignments from him. Gonzales averred that elimination of his flexible time schedule precluded him from performing his job adequately, in that he was

18

unable to follow leads, conduct field interviews, and fully investigate complaints. At least when viewed as part of the alleged pattern of retaliation, subjecting Gonzales to heightened scrutiny regarding his time and activities also could be found to constitute an adverse employment action. (*Id.* at pp. 1035, 1062 [triable issue of fact existed on the question of whether employer's allegedly heightened scrutiny of plaintiff's performance was retaliatory]; *Colarossi v. Coty US Inc.* (2002) 97 Cal.App.4th 1142, 1154.)

In its moving papers, the City attempted to prove legitimate, nondiscriminatory reasons for Gonzales's termination, the denial of his request for a full time position, and the reduction of his hours from 25 to 20. It did not, however, attempt to demonstrate that it had legitimate, nonretaliatory reasons for the other acts alleged to be retaliatory.[10] Accordingly, even if the City sufficiently demonstrated the absence of a material fact in regard to the termination, reduction of hours, and denial of a full time position, it did not establish the absence of a material fact on all the allegations underlying the Labor Code section 1102.5 cause of action, and summary adjudication could not properly have been granted on this ground.

In sum, because the City failed to show Gonzales's complaint did not allege a prima facie case, and did not establish the absence of a material issue of triable fact on the Labor Code section 1102.5 retaliation cause of action, summary adjudication was improperly granted on the fifth cause of action.

---

[10] Ward's declaration offered in support of the summary judgment motion did seek to explain the reasons for his request that Gonzales return to "a more structured work schedule." However, the City's separate statement of undisputed facts did not attempt to demonstrate, *as to the fifth cause of action*, that there was no material issue on whether the alleged flextime schedule change was nonretaliatory. The " ' "Golden Rule of Summary Adjudication . . . [is] if it is not set forth in the separate statement, *it does not exist*." ' [Citation.]" (*City of Pasadena v. Superior Court* (2014) 228 Cal.App.4th 1228, 1238, fn. 4.)

2. *Purported instructional errors*

Gonzales contends the trial court prejudicially erred by refusing to give three special instructions he requested.  We discern no prejudicial error.

a. *Evidence presented at trial*

As noted, at trial the sole remaining cause of action was retaliatory discharge in violation of the FEHA, section 12940, subdivision (h).  As relevant to the issues presented on appeal, the following evidence was adduced at trial.

(i)  *Gonzales's involvement with LULAC*

Gonzales was the president of the Long Beach Chapter of LULAC (League of United Latin American Citizens), a civil rights and advocacy organization that provided assistance to persons in need of housing or employment and located attorneys for persons who needed legal services.

(ii)  *Gonzales's complaints and communications about the CPCC's complaint handling practices*

Generally consistent with the allegations in his complaint, Gonzales presented testimony and/or documentary evidence that he repeatedly complained to Ward that the CPCC had become too close to the police department and was failing to adequately and objectively scrutinize complaints.  Gonzales felt there was "a problem" addressing minority complaints at the CPCC, and complaints from Latino citizens were being ignored or altered.  Additionally, he provided evidence he had complained about the elimination of a Spanish-language complaint line; the practice of taking complaints in the office waiting room, rather than in a private office; the presence of a  plaque in the lobby that he believed presented the appearance of favoritism toward the LBPD; the inappropriate comment at the police training class; and Ward's acquiescence in removal of race and ethnicity data from CPCC forms, a decision he felt would be "breaking the law" and preclude tracking of racial profiling.

In February 2006, City Councilwoman Reyes-Uranga emailed Gonzales to ask for his thoughts about the CPCC and its independence from the police department.  Gonzales told her that under Ward's tenure, citizen complaints were being characterized in a way

20

that obscured egregious allegations and, as a result, the decisions of internal affairs were not being meaningfully reviewed.

(iii) *The spitting incident*

In regard to the "spitting incident," Gonzales testified that Ward and internal affairs officers forced him to make a formal complaint. When Gonzales attended a community meeting as requested by Ward approximately one week after reporting the spitting incident, the police chief complained that Gonzales was soliciting complaints. At the commission hearing on the complaint several months later, commissioners made sarcastic wisecracks and one expressed dismay that Gonzales had made the spitting incident complaint, which the commission ultimately determined was unfounded. The episode undermined Gonzales's credibility. A former commissioner, Coqueece King, testified that she felt the decision on the spitting incident complaint had been a miscarriage of justice. Her contemporaneous notes of the meeting indicated she felt Ward failed to steer the discussion to the evidence, and he inappropriately demonstrated the officer's actions although he had not been present. Gonzales admitted that although he wished to file the complaint anonymously, he had already voluntarily told a police commander about it before telling Ward.

(iv) *The Quintana complaint, the "Issues of Concern" memo, and Gonzales's response*

Also in February 2006, Gonzales investigated the complaint made by Jessica Quintana, who was the director of the Centro CHA, a community organization. Gonzales suspected the substance of her complaint had been altered by the LBPD intake officer. He confirmed his suspicions in a meeting with Quintana. The commission ultimately sustained Quintana's complaint. Quintana testified at trial and corroborated Gonzales's account. After the commission meeting addressing the Quintana complaint, Ward gave the "Issues of Concern" memorandum to Gonzales, expressing unhappiness with Gonzales's handling of the Quintana complaint at the hearing. Ward stated that Gonzales had interjected his opinion that the complaint could be sustained when a commissioner asked him a question. An LBPD commander and two commissioners

21

expressed concern that Gonzales was siding with Quintana or taking a personal interest in the case and "editorializing." Gonzales had added a note to the file without Ward's knowledge; it outlined Quintana's community involvement, which, in the commissioners' and the police commander's opinions, appeared to be included in an effort to bolster Quintana's credibility. Ward cautioned that such behavior undermined the CPCC's credibility and objectivity; CPCC staff were required to maintain objectivity and not allow personal opinions or relationships to influence the preparation or presentation of a case.

This incident prompted Gonzales's written response, discussed in part *ante,* in which he detailed his concerns about the CPCC's lack of objectivity and discriminatory conduct. In addition to the aspects of Gonzales's response discussed *ante,* Gonzales objected that "the mere fact that Jessica Quintana is of Latin origin and race leads you to accuse me of being devious, and to blame me for your and the Commander's embarrassment that the two allegations were sustained." He further objected that Ward sometimes asked for Gonzales's opinion on the reasons for a Latina councilperson's comments, as if Gonzales would know merely because they were both Hispanic. Gonzales averred that the allegations raised by Ward in the "Issues of Concern" memo were a pretext for harassment and differential treatment "based on my color, race and national origin." He felt "disparate working conditions [had been] orchestrated for [him] based on [his] continued resistance to pressure from certain law enforcement operatives to not properly perform" his duties.

v. *Gonzales's allegations of retaliation*

Gonzales believed that various adverse actions were taken in retaliation for his complaints, including reduction of his hours; reduction and eventual removal of his caseload; denial of a full time position; and elimination of his flexible schedule.

vi. *Ward's and Quan's testimony*

Ward, who was a former Los Angeles Police Department officer, testified he did not treat people differently based on their ethnicity. He explained or denied the incidents cited by Gonzales and denied any retaliatory or discriminatory animus. He denied

22

showing any favoritism to the police. He denied the allegations Gonzales made in response to the "Issues of Concern" memorandum. Complaints were taken in the waiting room for reasons related to confidentiality and staff safety. Ward had no control over salaries. He did not cease to assign NFA files to Gonzales until after the Boecker investigation was completed. Gonzales's hours were increased from 20 to 25 at a point when the office was short staffed. Once another part time investigator, Henry Quan, was hired, Gonzales's hours were cut back to 20 per week for budgetary reasons. Gonzales's request for full time status was not feasible due to budgetary concerns; two part-time employees were more economical due to pension and other benefits available to full time employees. Ward had asked for permission to hire a full time investigator, but his request was denied. The requirement that Gonzales notify Ward when working after regular hours was motivated by safety concerns. Quan, who was trilingual and spoke Spanish, testified that he was also required to notify Ward when working at night. All employees were required to keep track of their time. Ward never told Gonzales to stay in the office or stop reviewing complaints. Gonzales admitted that his schedule remained flexible to the extent he could put in his hours any time during regular business hours and he could notify Ward if he needed to work outside daytime hours. It was undisputed that for the period covering May 2004 through June 2005, Ward gave Gonzales a performance evaluation rating him "outstanding." In July 2006, Ward requested that the City pay for Gonzales to attend a LULAC convention.

vii. *Case file statistics*

Of the 32 files that Gonzales handled between 2005 and 2006, Gonzales requested further action on six. Of those that Gonzales recommended be sent to the commission, the only file rejected for further investigation involved a White male complainant. The ratio of cases that went to the commission based on ethnicity stayed basically the same from 2004 to 2006.

23

(viii) *The Boecker complaint, the investigation, and Gonzales's termination*

Under the City's code of ethics, an employee has a conflict if public actions as a city employee affect personal financial interests, or the interests of immediate family. In 2004 Gonzales's wife entered into a contract with Boecker to assist her with legal matters. It called for Boecker to pay Ms. Gonzales five percent of any recovery arising from Boecker's pending litigation. The City learned of the relationship between Boecker and Gonzales after Boecker spoke to Anitra Dempsey, a city human dignity officer, and Lydia Hollie, at a community meeting. Boecker stated she was having problems with the police, and Dempsey referred her to the CPCC. Boecker stated she "didn't want to pay any more for help." She had various documents that she believed showed she would have to pay for services from the CPCC. Concerned about a potential violation of city policy, Dempsey and Hollie contacted Miller and Harrison, respectively. Ward and Quan interviewed Boecker. Boecker showed Ward a copy of the unsigned contract. She explained she had made a complaint to the CPCC. Gonzales offered to help her with her lawsuit in exchange for five percent of whatever she recovered. Based on this information, Ward concluded Gonzales might have converted an on-the-job contact into a business relationship, and recommended further investigation. Miller authorized an investigation. Ward selected an independent investigation firm that also acted as consultants to the LBPD's Internal Affairs department. Ward knew the investigator, Sobie, from his tenure with the Los Angeles Police Department.

Based on the investigator's conclusions that Gonzales converted a professional relationship into one for financial gain and provided false or misleading statements during the investigation, Ward recommended termination. Miller relied on the investigator's conclusions as grounds for termination. In making the decision to terminate, Miller consulted with Ward and the human resources department.

Gonzales admitted he first met Boecker when she filed a complaint with the CPCC in June 2004, but he was initially unaware of the contract and was not involved in his wife's paralegal business. Gonzales contended the investigation was biased, and Boecker was unstable and had a history of conflict with persons who tried to help her. A City

24

human resources employee's email to Ward stated, in regard to a potential retaliation claim by Gonzales, "That's why you have the investigation in your back pocket to be referred to in the future if necessary."

Gonzales's employment was terminated by Miller, based on the investigator's findings that Gonzalez violated city ethics/conflict of interest policies. Miller felt the findings called into question Gonzales's ethics, and integrity and trust were at the core of the CPCC's work.

b. *Instructions given and requested*

The trial court gave an instruction based on CACI No. 2505, as follows: "Plaintiff, Thomas Gonzales, claims that City of Long Beach retaliated against him because he pursued a claim of discrimination based upon ethnicity. To establish this claim, Thomas Gonzales must prove all of the following: [¶] 1. *That Thomas Gonzales pursued a claim of discrimination based upon his ethnicity*; [¶] 2. That City of Long Beach discharged Thomas Gonzales; [¶] 3. *That a substantial motivating reason for the decision to discharge Mr. Gonzales was the City of Long Beach's intention to retaliate against Thomas Gonzales for pursuing a claim of discrimina*tion; [¶] 4. That Thomas Gonzales was harmed; and [¶] 5. That City of Long Beach's conduct was a substantial factor in causing Thomas Gonzales' harm."[11] (Italics added.)

---

[11] In the reporter's transcript, the first element of the instruction given reads "Thomas Gonzales *proved* a claim of discrimination based upon ethnicity." (Italics added.) Gonzales's opening brief represents that the instruction's language was "*pursued* a claim of discrimination based upon his ethnicity." (Italics added.) Because the record on appeal did not contain most of the written instructions provided to the jury, we ordered counsel for Gonzales to file an appendix containing a copy of the written instructions. Counsel provided a partial appendix, but averred that not all the instructions given or refused were contained in the trial court's file. We have obtained the trial court's file, which contains a series of instructions under a document indicating they were given. The written instruction contained in the trial court's file uses the language "pursued a claim," rather than "proved a claim." The special verdict form tracks this language ("Did Thomas Gonzales pursue a claim of discrimination based upon his ethnicity?"). Given Gonzales's representation and the written documents, we conclude the reporter's transcript contains a typographical error.

25

In place of the foregoing, Gonzales requested special instruction No. 1, which had a different preface and stated different elements 1 and 3, as follows: "Plaintiff Thomas Gonzales claims that Defendants CPCC and the City of Long Beach retaliated against him *for opposing discriminatory treatment against Latino complainants of the Long Beach Police Department*. To establish this claim Mr. Gonzales must prove all of the following: [¶] 1. *That Mr. Gonzales reasonably and in good faith believed that the CPCC and the City of Long Beach discriminated against Latino complainants and himself*; [¶] . . . [¶] 3. *That Mr. Gonzales' opposition to the discrimination against Latino complainants was a motivating reason for the CPCC and the City of Long Beach's decision to terminate Mr. Gonzales' employment*." (Italics added.) Although the record is not entirely clear, it appears the court rejected special instruction No. 1 because it agreed with defense counsel that Gonzales's opposition to alleged discrimination against nonemployees was not a protected activity.

Gonzales also requested special instruction No. 5, as follows: "The employee need not prove the employer's practice was in fact discriminatory. Opposition is protected as long as the employee had a reasonable and good faith belief the employer's practice was unlawful. [¶] It is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case." The trial court declined to give special instruction No. 5. The record does not disclose the basis for its ruling.

Finally, Gonzales requested special instruction No. 4: "In order to prevail on his claim for retaliation, Thomas Gonzales must prove with substantial evidence that any of the persons involved in bringing about the adverse action held a retaliatory animus, provided that such person's animus operated as a 'but-for' cause, i.e., a force without which the adverse action would not have happened." The trial court declined to give this instruction because it felt it was duplicative of "one of the other instructions that I'm going to give."

26

c. *Verdict*

The jury returned a special verdict in favor of the City. The special verdict form contained five questions: "1. Did Thomas Gonzales pursue a claim of discrimination based upon his ethnicity? 2. Did the City of Long Beach discharge Thomas Gonzales? 3. Did the City of Long Beach intend to retaliate against Thomas Gonzales for pursuing a claim of discrimination? 4. Was the intention of the City of Long Beach to retaliate against Thomas Gonzales a substantial motivating reason for the termination of Thomas Gonzales? 5. Was the City of Long Beach's conduct a substantial factor in causing harm to Thomas Gonzales?" The form instructed the jury to answer each subsequent question only if the answer to the preceding question was affirmative. The jury answered "Yes" to the first two questions, and "No" to the third.

d. *Standard of review and applicable legal principles*

A party is entitled to have the jury instructed on his or her theories of the case that are supported by substantial evidence. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572; *Ayala v. Arroyo Vista Family Health Center* (2008) 160 Cal.App.4th 1350, 1358; *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475 (*Alamo*).) A trial court "may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule, supra,* at p. 572.) A court may refuse a proposed instruction that incorrectly states the law. (*Alamo, supra,* at p. 475.)

We independently review claims of instructional error. (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 743; *Alamo, supra,* 219 Cal.App.4th at p. 475.) When the contention on appeal is that the trial court erred by failing to give a requested instruction, we review the record in the light most favorable to the claim of instructional error. (*Alamo,* at p. 475; *Ayala v. Arroyo Vista Family Health Center, supra,* 160 Cal.App.4th at p. 1358; *Mize-Kurzman, supra,* 202 Cal.App.4th at pp. 845-846.) When an instruction is erroneous, "we assume the jury might have believed the evidence favorable to the appellant and rendered a verdict in appellant's favor on those issues as to which it was misdirected." (*Mize-Kurzman,* at p. 846.)

27

"FEHA declares it an 'unlawful employment practice' for any employer 'because of the race, . . . color, national origin, ancestry . . . of any person, . . . to discharge the person from employment . . . , or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.' [Citation.] The statute also prohibits employers from retaliating against employees for engaging in protected activity—i.e., for 'discharg[ing], expel[ling], or otherwise discriminat[ing] against any person because the person has opposed any practices forbidden under this part . . . .' " (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1219.) To establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he engaged in a protected activity, (2) the employer subjected him to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. (*Yanowitz, supra,* 36 Cal.4th at p. 1042.)

e. *Special instruction No. 1*

Gonzales argues that, by refusing special instruction No. 1, the trial court failed to instruct on his theory of the case, thereby "preordain[ing] a verdict for the defense." Under the instructions given, the jury could consider whether the City retaliated against Gonzales as a result of his accusations the City had discriminated against *him personally* due to his race or national origin. However, the jury was precluded from finding the City retaliated because of Gonzales's criticism of the CPCC's handling of complaints by Latino community members. Put differently, under the instructions given, Gonzales's accusation that the CPCC discriminated against non-employees who complained about police misconduct was not a protected activity. We conclude the trial court did not err by declining special instruction No. 1 because it was an incorrect statement of law and because it was not supported by substantial evidence.[12]

---

[12] The City argues that special instruction No. 1 was properly refused as duplicative, because the third element listed in the instruction given (a substantial motivating reason for Gonzales's discharge was the City's intent to retaliate against him for "pursuing a claim of discrimination") was broad enough to include complaints made about discrimination against other persons. Moreover, because the jury found in Gonzales's favor on the first question on the verdict form ("Did Thomas Gonzales pursue a claim of

28

FEHA's antiretaliation provision, section 12940, subdivision (h), provides that it is an unlawful employment practice for any employer to discharge or discriminate against "any person because the person has opposed *any practices forbidden under this part . . .*" (Italics added.)  Discrimination by an employer of *nonemployees* is not an act prohibited by the FEHA.[13]  The FEHA generally protects only employees and applicants.  (*Hirst v. City of Oceanside* (2015) 236 Cal.App.4th 774, 782.)  " 'The FEHA prohibits *employment* discrimination . . . ,' not discrimination or retaliation in other relationships.  [Citation.]  'The fundamental foundation for liability is the "existence of an *employment* relationship between the one who discriminates . . . and [the person] who finds himself the victim of that discrimination."  [Citation.] . . . "If there is no proscribed 'employment practice,' the FEHA does not apply." ' "  (*Fitzsimons v. California Emergency Physicians Medical Group* (2012) 205 Cal.App.4th 1423, 1426-1427; see also *Shephard v. Loyola Marymount Univ.* (2002) 102 Cal.App.4th 837, 840 [college athlete's FEHA discrimination claim was barred as a matter of law because she was a student, not an employee]; *Vernon v. State of California* (2004) 116 Cal.App.4th 114, 123 [the FEHA prohibits only an employer from engaging in improper discrimination and predicates

---

discrimination based upon his ethnicity?"), they urge that the allegation of instructional error is moot.  We disagree.  The first element in the instruction given asked whether Gonzales "pursued a claim of discrimination *based upon his ethnicity*."  (Italics added.)  As a matter of common sense, the jury was likely to read the phrase "pursued a claim of discrimination" in the third element as referring back to the claim of discrimination referenced in the first element, i.e., a claim of discrimination based upon *Gonzales's* ethnicity, not claims of discrimination against *other* persons.  Similarly, the first question listed in the special verdict form was whether Gonzales "pursue[d] a claim of discrimination based upon *his ethnicity*."  (Italics added.)  The jury's true finding on this element did not necessarily encompass a finding that Gonzales pursued a claim of discrimination against other persons.

[13]  We express no opinion on whether Gonzales's opposition to allegedly discriminatory treatment of complainants might violate some statute or regulation other than the FEHA.  The only issue before us is whether the trial court properly instructed on the FEHA cause of action.

29

liability on the existence of an employment relationship between the one who discriminates and the victim of that discrimination].)[14]

Here, the CPCC's treatment of complainants was not a "practice forbidden under" the FEHA,[15] because there was no employment relationship between the complainants and the CPCC. In the absence of such an employment relationship, the conduct alleged – favoring the police department and failing to fully or adequately investigate complaints about police misconduct – is not a practice forbidden by the FEHA. (See, e.g., *Wimmer v. Suffolk County Police Dept.* (2d Cir. 1999) 176 F.3d 125, 134-135 [probationary police officer did not engage in protected activity for purposes of Title VII when he reported racial slurs made by other officers to Black citizens because "his opposition was not directed at an unlawful *employment practice*"]; *Crowley v. Prince George's County, Md.* (4th Cir. 1989) 890 F.2d 683, 687 [police department employee's claim he had been retaliated against for investigating instances of racial harassment perpetrated by police officers against members of the community was not cognizable under Title VII]; *Kunzler v. Canon, USA, Inc.* (E.D.N.Y. 2003) 257 F.Supp.2d 574, 581-582 [employee did not engage in protected activity when he reported that his supervisor sexually harassed a customer]; *Klinger v. BIA, Inc.* (N.D.Ill., Oct. 18, 2011, No. 11-C-05346) 2011 U.S.Dist Lexis 119842, *2 [Title VII retaliation claim dismissed because

---

[14] Of course, an employer may be responsible for "the acts of nonemployees, with respect to sexual harassment of employees," and other persons, where the employer knows or should have known of the conduct but fails to take corrective action. (§ 12940, subd. (j)(1).) This precept is not at issue here.

[15] Gonzales cites several cases for proposition that an employee's complaints about discrimination against other persons is a protected activity. Certainly, an employee's opposition to harassment or discrimination of a fellow employee is a protected activity. (See *Flait v. North American Watch Corp., supra,* 3 Cal.App.4th at p. 477.) But except for *Moyo v. Gomez* (9th Cir. 1994) 40 F.3d 982 (*Moyo*) and *Small v. Feather River College* (E.D.Cal., May 2, 2011, No. 10-CV-3026-JAM-GGH) 2011 U.S.Dist. Lexis 51579, the complaints in the cited cases either pertained to discrimination by an employer against employees, or did not involve retaliation claims under the FEHA or Title VII. We see no reason to extend the FEHA's protections under the facts presented here for the reasons discussed *infra.*

30

defendant's "alleged treatment of its customers [did] not constitute unlawful *employment* practices prohibited by Title VII, and thus [plaintiff's] opposition to the discriminatory treatment cannot form the basis of a Title VII retaliation claim"].)[16] Having chosen to bring a FEHA cause of action, Gonzales could not seek to recover under a theory of retaliation not covered by the FEHA.

Gonzales correctly points out that an employee's conduct may constitute protected activity "not only when the employee opposes conduct that ultimately is determined to be unlawfully discriminatory under the FEHA, but also when the employee opposes conduct that the employee reasonably and in good faith believes to be discriminatory, whether or not the challenged conduct is ultimately found to violate the FEHA. It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA. [Citations.]" (*Yanowitz, supra,* 36 Cal.4th at p. 1043; *Miller v. Department of Corrections, supra,* 36 Cal.4th at pp. 473-474; *Flait v. North American Watch Corp., supra,* 3 Cal.App.4th at p. 477.) The good faith mistaken belief may be either of fact or of law, and employees are not required to "elaborate to their employer on the legal theory underlying the complaints they are making, in order to be protected by the FEHA." (*Miller,* at pp. 474-475.)

In support of his argument, Gonzales cites *Moyo, supra,* 40 F.3d 982. There, a Black corrections officer complained he was fired for protesting against and refusing to cooperate with the California Department of Corrections' discriminatory practice of allowing showers after work shifts to White inmates, but not to Black inmates. (*Id.* at

---

**16** When interpreting the FEHA, California courts often look for guidance to federal decisions construing analogous provisions of Title VII of the federal Civil Rights Act of 1964. (*Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 109; *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 984.) Unpublished federal opinions are citable notwithstanding California Rules of Court, rule 8.1115, which only bars citation of unpublished California opinions. (*Edwards Wildman Palmer LLP v. Superior Court* (2014) 231 Cal.App.4th 1214, 1227, fn. 6.)

31

p. 984.)  He sued for retaliation under Title VII, section 704, subdivision (a).  That provision, like section 12940, subdivision (h), required that the plaintiff show he "protested or otherwise opposed unlawful employment discrimination directed against employees protected by Title VII." (*Moyo*, at p. 984.)  The district court dismissed for failure to state a claim, and the Ninth Circuit reversed.  (*Ibid.*)  As with the FEHA's retaliation provision, "opposition clause protection will be accorded 'whenever the opposition is based on a "*reasonable* belief" that the employer has engaged in an unlawful employment practice.' " (*Ibid.*)  Even if the inmates did not qualify as employees, Moyo could show he engaged in a protected activity in two ways.  First, he could show he was required, as a condition of his employment, to discriminate against Black inmates, and was discharged for refusing to do so.[17]  "Second, regardless of whether the inmates . . . actually qualified as employees, . . . [i]f Moyo reasonably believed that the inmates were protected by Title VII, then his opposition to their treatment would be a statutorily protected activity." (*Id.* at p. 985.)  The reasonableness of his belief was to be assessed according to an objective standard, taking into account the "limited knowledge" possessed by most Title VII plaintiffs about the factual and legal bases for their claims.  (*Moyo,* at p. 985; see also *Small v. Feather River College, supra,* 2011 U.S.Dist. Lexis 51579 [motion to dismiss for failure to state a claim denied where college football coach alleged retaliation for opposing the treatment of Black players; viewing the allegations in the light most favorable to plaintiff, the court could infer he reasonably believed he was engaging in a protected activity].)

But Gonzales cites no authority holding that such a reasonable, good faith belief may exist under the circumstances here, when the alleged victims of discrimination are obviously not in an employment relationship with the defendant.  (See *McMenemy v. City of Rochester* (2d Cir. 2001) 241 F.3d 279, 285, fn. 3 [distinguishing *Wimmer* on the ground it "should have been plain to the plaintiff and to any other lay person that

---

[17]     There was no evidence the CPCC required Gonzales, as a condition of his employment, to engage in discriminatory conduct himself in the sense suggested in *Moyo,* and this was not a theory raised below.

32

[plaintiff's] complaint of retaliation for opposing discrimination by co-employees with respect to the general public was not a complaint about an employment practice"].) The facts here contrast with those in *Moyo* and *Small v. Feather River College*. In *Moyo*, the Ninth Circuit observed it was "unable to say, based on the bare facts in the complaint, that the inmates . . . were not 'employees' under Title VII. Ninth Circuit precedent acknowledges that prison inmates can be 'employees' in certain circumstances." (*Moyo, supra,* 40 F.3d at p. 985.) A college football coach's mistaken belief that players, who are subject to the rules and requirements of a college team, might be employees, may be reasonable. Here, in contrast, it is difficult to infer that Gonzales – the president of a Latino "community civil rights advocacy organization" who was employed in a position he describes as "civil rights investigator," could have reasonably believed the CPCC's treatment of non-employee complainants was an unlawful *employment* practice. Gonzales was not unsophisticated. In one of his emails to the City's human resources office, he explained he viewed alternative dispute resolution "as preliminary to bringing an action forward through DFEH or EEOC." He stated in another email that he was opposing an employment practice he believed to be "unlawful under Title VII of the Civil Rights Act of 1964."[18] Gonzales clearly had some familiarity with the relevant antidiscrimination laws, and even a rudimentary understanding would have made clear nonemployee complainants are not covered by the FEHA.

---

[18] The record is not entirely clear what Gonzales's "Title VII" statement referenced, but it does not appear to pertain to alleged treatment of complainants. The email itself was in regard to Gonzales's request for bilingual skill pay. The mention of an unlawful employment practice appears to reference Gonzales's earlier allegation in the response to the "Issues of Concern" memo that he personally was experiencing harassment and discrimination based on his own national origin.

Gonzales offered virtually no evidence that he had a reasonable and good faith belief the CPCC's conduct vis a vis complainants amounted to an unlawful employment practice. He did not testify or offer substantial evidence showing he had such a belief. He did not proffer any evidence upon which a jury might have concluded such a belief was reasonable. While there was evidence he thought the CPCC's conduct was "discriminatory" in a general sense, there was a dearth of evidence he thought it was unlawful discrimination in *employment.*

There was likewise little or no evidence Gonzales reasonably believed the CPCC's handling of complaints was genuinely *discriminatory,* as opposed to inadequate all around. The primary thrust of Gonzales's complaints was that he believed the CPCC was too closely aligned with the police department, tended to "rubber stamp" the conclusions of the internal affairs department, and failed to adequately investigate the majority of all complaints, not just those made by Latinos. While his concerns were primarily focused on complaints by Latinos, there was no showing that the CPCC applied a different standard to Latino complainants than to other complainants. (Cf. *Yanowitz, supra,* 36 Cal.4th at p. 1048 [application of a different standard to a female than to a male employee constitutes sex discrimination].) Gonzales did not testify or offer any evidence that CPCC complaints made by Latinos were treated less favorably or taken less seriously than CPCC complaints made by persons of any other race or national origin. There was no suggestion, for example, that the CPCC fully investigated or favored complaints by Asian, White, or African American complainants, while at the same time giving short shrift to those made by Latinos. (Cf. *Yanowitz,* at pp. 1035, 1044 [evidence manager reasonably believed order to fire insufficiently attractive female sales associate represented application of a different standard for female and male associates was sufficient to withstand summary judgment; manager had hired and supervised both male and female associates, but had never been asked to fire an unattractive male].) The conclusory use of phrases like "disparate treatment" is not a substitute for actual evidence of a reasonable belief a discriminatory practice existed.

In sum, Gonzales did not present evidence from which the jury could have concluded he reasonably believed he was complaining about an unlawful employment practice involving the disparate treatment of Latino complainants. Because there was no substantial evidence demonstrating Gonzales had a reasonable, good faith belief the CPCC's treatment of complainants violated the FEHA, the trial court properly declined to give special instruction No. 1.

f. *Special instruction No. 5*

As set forth *ante,* special instruction No. 5 would have informed the jury that an employee need not prove the employer's practice was actually discriminatory, and opposition was protected as long as the employee had a reasonable and good faith belief the practice was unlawful. To the extent it pertained to Gonzales's theory that the City retaliated against him for complaining that Ward's conduct discriminated against him on the basis of *his own race or national origin*, the instruction was a correct statement of law and should have been given. However, any error was manifestly harmless. The jury found in Gonzales's favor on the first question on the special verdict form, i.e., whether Gonzales pursued a claim of discrimination based upon his ethnicity. Special instruction No. 5 was relevant only to this question. Because the jury found in Gonzales's favor on this point, he cannot have been prejudiced by omission of the requested instruction.

g. *Special instruction No. 4*

As to his request that the trial court instruct with special instruction No. 4, Gonzales acknowledges that the instruction was, in part, an incorrect statement of law. *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 held a plaintiff is not required to prove "but for" causation in order to establish liability under the FEHA. (*Id.* at pp. 229-230; *Alamo, supra,* 219 Cal.App.4th at p. 477.) A trial court is not required to give an incorrect instruction. (*Alamo,* at p. 475.)

Gonzales argues that the instruction was nonetheless necessary to clarify that the jury was not limited to evaluating the motives or knowledge of the ultimate decision maker, City Manager Miller, but could also examine whether the supervisor with the alleged retaliatory animus, Ward, caused the adverse action. Gonzales contends the

35

wording of the special verdict form, to which he objected – "Did the City of Long Beach intend to retaliate against Thomas Gonzales for pursing a claim of discrimination?" – improperly presented the City as a unitary, indivisible entity.  He relies on what has "been colorfully referred to as the 'cat's paw' doctrine." (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551.)  Under that principle, a plaintiff need not demonstrate that every individual who participated in the adverse employment action shared a discriminatory animus.  A showing that "a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus." (*DeJung, supra,* at p. 551; see generally *Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639, 665-666.)  It "is not enough to show that one actor acted for lawful reasons when that actor may be found to have operated as a mere instrumentality or conduit for others who acted out of discriminatory or retaliatory animus . . . .  If a supervisor makes another his tool for carrying out a discriminatory action, the original actor's purpose will be imputed to the tool, or through the tool to their common employer." (*Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 113.)  Gonzales theorizes that the evidence supported the proposed instruction because Miller admittedly delegated tasks; Ward chose the independent investigator; Miller terminated Gonzales upon Ward's recommendation; there was evidence Ward held a "retaliatory animus" against Gonzales; and the City's closing argument emphasized Miller's lack of retaliatory animus.

But even assuming arguendo the trial court erred, no prejudice is apparent.  A failure to properly instruct a jury in a civil case is not inherently prejudicial.  (*Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 580; *Mize-Kurzman, supra,* 202 Cal.App.4th at p. 846.)  A judgment may be reversed for instructional error only when it is reasonably probable the party challenging the ruling would have obtained a more favorable result had the instruction been given.  (*Soule,* at pp. 570, 580; *Alamo, supra,* 219 Cal.App.4th at pp. 475-476.)  The determination of prejudice depends on the particular nature of the error, including the degree of conflict in the evidence on critical

36

issues; the effect of other instructions; the arguments of counsel; any indications by the jury itself that it was misled; and the closeness of the verdict. (*Soule,* at pp. 570-571, 580-581.)

Here, no instruction suggested that only the final decision maker's animus, or lack thereof, could be considered. While the City's closing argument emphasized that Miller bore no animus toward Gonzales, counsel did not argue that the jury was precluded from considering Ward's role in the termination; he argued that Miller based his decision on input from others, including Ward. Counsel for the City also urged that Ward did not bear any discriminatory animus towards Gonzales. Given the focus at trial on Ward's conduct, it is fanciful to assume the jury ignored Ward's role. Moreover, the trial court gave another special instruction Gonzales requested that provided: "If the Plaintiff presents sufficient evidence that the decision to fire him was substantively or procedurally flawed, and a reasonable inference can be drawn that personal animosity, unlawful discrimination, or any other malicious motive prompted Plaintiff's discharge, then the employer's proffered legitimate business reason for termination may not have been reasonable or made in good faith." This instruction would have suggested to reasonable jurors that Ward's alleged discriminatory animus was relevant regardless of the fact Miller was the person who actually terminated Gonzales's employment.

DISPOSITION

The grant of summary adjudication on the fifth cause of action for violation of Labor Code section 1102.5 is reversed and the matter is remanded for further proceedings in accordance with this opinion. The judgment is otherwise affirmed. Each party shall bear its own costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**




ALDRICH, J.



We concur:




EDMON, P. J.




LAVIN, J.